748 So.2d 554 (1999)
STATE of Louisiana
v.
Scott MEYERS.
No. 97-KA-2584.
Court of Appeal of Louisiana, Fourth Circuit.
November 24, 1999.
*556 Harry F. Connick, District Attorney, Orleans Parish, Nicole Barron, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
John H. Thomas, Arnold & Thomas, New Orleans, Louisiana, Counsel for Defendant/Appellant.
*557 Court composed of Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG, Judge DENNIS R. BAGNERIS, Sr.
BAGNERIS, Judge.

STATEMENT OF THE CASE
By bill of information dated June 24, 1994, Scott Meyers, Kentrell Young, and Nathaniel Williams were charged by bill of information with one count of armed robbery and one count of attempted second degree murder. Meyers, Young and Williams all pled not guilty. Meyers was tried separately from Young and Williams by a twelve-member jury that found him guilty as charged on both counts. Meyers was sentenced to ninety-nine years at hard labor without benefit of parole, probation, or suspension on the armed robbery count and to fifty years at hard labor without benefit of parole, probation, or suspension of sentence on the attempted second degree murder count, with the sentences to run consecutively. Subsequently, the State filed a multiple bill, but on August 1, 1996, after numerous continuances, the State decided not to file the multiple bill. Meyers filed motions for new trial. The trial court dismissed the motions for new trial.

STATEMENT OF THE FACTS
Michael Rouse testified that on May 8, 1994, at approximately 5:30 a.m., he and his wife returned home and discovered their son Christopher lying on the floor in a pool of blood. Mr. Rouse further testified that when his wife went to call 911, she discovered that the phones were missing. Mr. Rouse also stated that he noticed that Christopher was blinking his eyes and that his wife then went to a neighbor's house to call for help. Mr. Rouse asked his son who did this to him, and he testified that Christopher said, "Scott Meyers and Kentrell." Mr. Rouse also testified that a safe was missing and that his wife's jewelry box was upside down on the floor of the bedroom. He further testified that there was blood all over the house. Mr. Rouse testified that the doctors informed him that Christopher had been shot twice with one bullet piercing the spinal cord.
Christopher Rouse testified that he had had a party at the house while his parents were out of town, and Christopher admitted that he drank alcohol and smoked marijuana. After his friends left, Christopher lay down on the sofa and fell asleep. He awoke to answer the door and saw Meyers, whom he had known for about two years. He opened the door to let Meyers into the house, and Meyers hit him in the face. Christopher testified that Meyers had a gun in his hand and that Kentrell Young and Nathaniel Williams came into the house with Meyers. After the trio came in, Meyers hit Christopher in the nose and demanded money. Christopher testified that Meyers said that Meyers was going to kill Christopher and that the trio then dragged Christopher through the house. Christopher said that when the three men went into his parents' bedroom, they took jewelry and demanded that Christopher give them the combination to the safe. Christopher testified that he told them that he did not know the combination, but that it was probably in his parents' file cabinet. Christopher testified that he was then taken over to the file cabinet and beaten by Meyers and Kentrell. After this, he was dragged into the study where he was beaten again, and he blacked out. Christopher stated that Nathaniel Williams was not present when this happened and that the only person he saw with a gun was Meyers. Christopher testified that the next thing he remembered was that his parents came home, and that he realized he was paralyzed and was "pretty sure" he was dying. Christopher stated that he was left paralyzed from the shoulders down. He was able to pick out all three men from a photographic lineup. He admitted that he owed Kentrell fifty dollars for drugs.
*558 Nathaniel Williams testified that after he had come home from band practice, he received a telephone call from Meyers to come over to Meyers' house. After staying at Meyers' house for a while, they left to pick up Kentrell Young. Williams further testified that they then went to Christopher Rouse's house. Williams stated that Meyers went to the door while he and Kentrell stood to the side. Williams also testified that when Christopher opened the door to let Meyers in, Meyers, who had a gun in his hand, hit Christopher. Williams testified that Christopher asked Meyers why he did it, and Meyers replied that Christopher owed Meyers money. Meyers then ordered Williams to get a knife from the kitchen. Williams stated that after Christopher got the knife, Christopher gave it to Meyers. Williams testified that Kentrell also asked Williams to get a knife so that Kentrell could use it to open drawers without leaving fingerprints. Williams said that Kentrell was in the parents' bedroom when Williams gave Kentrell the knife and that Meyers was dragging Christopher into another room, which Williams called a dayroom. Williams said that he went into Christopher's room and sat on the bed for a short time. Williams stated that he then went to the parents' bedroom, where Meyers had dragged Christopher and where Meyers kept asking for the combination to the parents' safe. When Christopher said that he did not know the combination, Williams and Meyers went back to the dayroom to look through a filing cabinet. Williams testified that he went back into Christopher's bedroom and then heard a gunshot. Williams went to the dayroom and saw Christopher lying on the floor bleeding. Williams testified that Meyers and Kentrell were both in the room and that Meyers had a gun in his hand. Williams further testified that the gun jammed and that a bullet was ejected from it. Williams also stated that Meyers demanded that Williams hand Meyers a knife. Williams did so. Williams testified that Meyers then began stabbing Christopher in the back of the head. Williams further testified that after Meyers stopped stabbing Christopher, he ordered Williams to cut Christopher's throat. Williams stated that he took the knife, put the blade in a position where it was not showing and could not cut Christopher, and moved the knife as if he were cutting Christopher's throat. Williams further testified that he and Kentrell picked up the safe and carried it to Meyers' car and that they then drove to Meyers' house to drop off the safe. Williams also stated that the gun was thrown into Bayou St. John near the St. Bernard housing project and that they went back to Christopher's house where Meyers picked up bullets and bullet shells. Williams admitted that he had been drinking prior to the attack on Christopher, but he denied smoking marijuana.
Meyers testified that he met Williams and Kentrell that evening at his house and that they were going to another friend's house to get some marijuana. They then decided to go to Christopher's house to collect the money he owed Kentrell. Meyers admitted that when Christopher let them into the house, he punched Christopher out of anger. He denied beating Christopher and testified that Williams hit Christopher. He further testified that he did not see anything else that happened and that Kentrell admitted shooting Christopher. He also denied stabbing Christopher and stated that he saw Williams with a knife but did not see him use it. Meyers further denied taking any money or jewelry, and he said that Kentrell took the majority of the jewelry, with Williams having only a few things. On cross-examination, Meyers testified that he went outside after hitting Christopher because he felt "paranoid" from drinking and smoking marijuana. Meyers admitted writing a letter to Williams while he was in jail in which he reminded Williams of a promise not to be misled. Meyers stated that this meant that they had promised to stick together. Meyers was asked what he meant when he stated in the letter that Williams was to "chill" and not tell the *559 D.A. anything and that he would be mad if Williams "cop[ped] out to some bull". Meyers replied that it meant that he would be mad if Williams lied. Meyers admitted writing that there was nothing on them except Williams' statements, which were not worth anything unless he got on the stand, and that Kentrell's lawyer said that he was singing like a "jay bird."

DISCUSSION

ERRORS PATENT
A review of the record shows two errors patent. The record if devoid of any indication of whether Meyers entered a plea when he was arraigned. The minute entry notes that Nathaniel Williams pled not guilty through counsel when he, Meyers, and Kentrell Young were arraigned on June 28, 1994. However, the minute entry fails to indicate whether Meyers entered a plea at that time. LSA-C.Cr.P. art. 555 provides that the failure to arraign the defendant or the fact that he did not plead is waived if the defendant enters upon trial without objecting thereto and that it shall be considered as if he had pled not guilty. Because the record reflects that Meyers failed to object, it is considered that he pled not guilty.
The second error patent concerns Meyers' sentence for attempted second degree murder. Meyers' sentence was to be served without benefit of parole, probation, or suspension of sentence. At the time of the offense, LSA-R.S. 14:27(D)(1) provided that if the offense attempted is punishable by death or life imprisonment, the defendant shall be imprisoned at hard labor for not more than fifty years. However, LSA-R.S. 14:27(D)(1) was silent as to parole, probation, or suspension of sentence. Thus, Meyers' sentence without benefit of parole, probation, or suspension of sentence is illegal and must be vacated, and the case remanded for re-sentencing consistent with the applicable statute. See State v. Holmes, 95-2249 (La.App. 4th Cir. 10/29/97), 701 So.2d 752.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, Meyers contends that inflammatory statements made by the prosecutor during closing argument unfairly prejudiced the jury. However, Meyers failed to object to the alleged inflammatory statements made by the State during its closing and rebuttal arguments. Thus, this issue has not been preserved for appellate review. La. C.Cr.P. art. 841.

ASSIGNMENT OF ERROR NUMBER TWO
Meyers contends that he received ineffective assistance of counsel. Meyers argues that his trial counsel failed to object to inadmissible hearsay testimony provided by Michael Rouse. Further, Meyers contends that his counsel failed to conduct a rudimentary search for defense witnesses. Additionally, Meyers contends that his counsel failed to file a motion to sever his trial from that of Kentrell Young.
Generally, the issue of ineffective assistance of counsel is a matter more properly raised in an application for postconviction relief to be filed in the trial court where a full evidentiary hearing can be held. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Sparrow, 612 So.2d 191 (La.App. 4th Cir.1992). Only when the record contains the necessary evidence to evaluate the merits of the claim can it be addressed on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Kelly, 92-2446 (La.App. 4th Cir. 7/8/94), 639 So.2d 888, writ denied 94-2087 (La.1/6/95), 648 So.2d 921.
We pretermit any discussion regarding Meyers' argument concerning his trial counsel's failure to search for witnesses. There is insufficient evidence in the record to make a determination on the merits of this claim due to the lack of any testimony *560 or other evidence in the record regarding any efforts Meyers' trial counsel may or may not have made to find defense witnesses. However, we find that the record is sufficient to evaluate Meyers' other claims of ineffective assistance.
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. With regard to counsel's performance, the defendant must show that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. As to prejudice, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, i.e. a trial whose result is reliable. Id., 466 U.S. at 687, 104 S.Ct. at 2064. Both showings must be made before it can be found that defendant's conviction resulted from a breakdown in the adversarial process that rendered the trial result unreliable. Id. If an alleged error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel. State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir.1986). Moreover, hindsight is not the proper perspective for judging the competence of counsel's decisions because opinions may differ as to the advisability of a tactic; and, an attorney's level of representation may not be determined by whether a particular strategy is successful. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). A claim of ineffective assistance may be disposed of on the finding that either one of the two Strickland criteria has not been met. State v. James, 555 So.2d 519 (La. App. 4th Cir.1989), writ denied 559 So.2d 1374 (La.1990). If the claim fails to establish either prong, the reviewing court need not address the other. Murray v. Maggio, 736 F.2d 279 (5th Cir.1984).
Meyers asserts that his counsel was ineffective for failing to move for a severance of his trial from that of Kentrell Young because his trial would have been continued until after Kentrell's trial, which in turn would have allowed him to call Kentrell as a witness to testify that Meyers did not participate in the attempted murder. The record shows that Meyers was tried alone and that Kentrell Young subsequently pled guilty. Meyers' argument that Kentrell would have given favorable testimony is highly speculative, and there is no basis in the record for concluding that Meyers' trial counsel was ineffective in this regard.
As to counsel's failure to object to hearsay evidence, there is no basis for concluding that this warrants the reversal of Meyers' conviction under Strickland. The alleged hearsay in question was testimony by Michael Rouse that his son Christopher told him that he had been shot by Meyers and Kentrell. But later in the trial, Christopher himself testified that he told his father that he had been shot by Meyers and Kentrell. Additionally, Christopher was extensively cross-examined about his identification of Meyers as the person who shot him. LSA-C.E. art. 801, subd. D(1)(c) provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination and if the statement is one of identification of a person after perceiving him and which confirms the testimony of the declarant that he made an identification. In State v. Baker, 582 So.2d 1320 (La.App. 4th Cir. 1991), writ denied 590 So.2d 1197 (La. 1992), cert. denied Baker v. Louisiana, 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992), the victim's neighbor testified that the victim told him that the defendant had shot her. This court found that the neighbor's testimony was not hearsay under Article 801, subd. D(1)(c) because the victim testified at trial and was subject to cross-examination about her identification of the defendant. The situation in the present case is essentially the same as that in State v. Baker; therefore, Meyers' trial *561 counsel was not ineffective for failing to object to Michael Rouse's testimony.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS THREE AND FIVE
In these two assignments of error, Meyers complains that the trial court erred in dismissing his motion for new trial and that the motion should have been granted because of newly discovered evidence, namely the testimony of Danielle Ledet and evidence of a deal between Nathaniel Williams and the State.[1] Meyers' appellate counsel states in his brief that he discovered that Ms. Ledet was a witness after Meyers' trial. Ms. Ledet signed an affidavit in which she stated that Meyers, Williams, and Kentrell Young were at her house before and after the offense. She then stated that she had heard Kentrell Young admit that he was the one who shot Christopher Rouse and that Meyers did not participate in any violence against Christopher Rouse. She further stated that she was working in Venezuela at the time of Meyers' trial.
The trial court dismissed Meyers' motion for new trial on March 21, 1997, without holding a hearing on the merits of the motion; and, the minute entry states that the motion was dismissed when defense counsel failed to appear in court. In his brief, defense counsel states that he checked in with the minute clerk earlier that morning. Because the court was occupied with motion hearings in another matter, counsel states that he went to another section of court for ten minutes while Ms. Ledet waited outside the courtroom. He further states that Ms. Ledet was gone when he returned and that the trial court dismissed the motion while he looked for her. Defense counsel also states that he objected to the dismissal, but there is nothing in the record to indicate that defense counsel made an objection.
Treating the dismissal of the motion for new trial as a denial of the motion, it does not appear that the trial court's ruling was in error. When a motion for new trial is based on newly discovered evidence, the defendant must show, among other things, that notwithstanding the exercise of reasonable diligence, the new evidence was not discovered before or during trial. LSA-C.Cr.P. art. 854(1). In the present case, Meyers has not made that showing. In Ms. Ledet's affidavit, she stated that Meyers and his two companions were at her home before and after the offense; and there are indications in the record that she was either Meyers' girlfriend or fiancée. Thus, Ms. Ledet was not unknown to Meyers before his trial. Although she stated that she was out of the country at the time of Meyers' trial, there is nothing in the record to show that any effort was made to procure her attendance at trial. As to newly discovered evidence as to an alleged deal between Williams and the State, Meyers has not presented any actual evidence of a deal; and, the merits of this particular issue are discussed more fully in Assignment of Error Number Four (See below). These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
In his fourth assignment of error, Meyers complains that he was denied his right to confront his accusers when he was not allowed to cross-examine Nathaniel Williams regarding the deal he made with prosecutors to testify against Meyers. Meyers argues that the State's failure to inform him of the deal is a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. *562 1194, 10 L.Ed.2d 215 (1963), because the deal constitutes exculpatory evidence.
The State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, id.; State v. Phillips, 670 So.2d 588 (La.App. 4th Cir. 1996), 670 So.2d 588, writ denied 96-2131 (La.9/5/97), 699 So.2d 85. Included in this rule is evidence that impeaches the testimony of a witness whose reliability or credibility may determine guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Although the prosecutor is not required to deliver his entire file to defense counsel, he must disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. State v. Rosiere, 488 So.2d 965 (La.1986).
Under La. C.E. art. 607, a witness' credibility may be challenged by the introduction of extrinsic evidence of bias or interest. This includes evidence of the existence of a deal or agreement with the State in which the witness receives any benefit or gain in exchange for his testimony. State v. Matthews, 679 So.2d 977 (La. App. 4th Cir. 1996), writ denied 96-2332 (La.1/31/97), 687 So.2d 403; State v. Smith, 591 So.2d 1219 (La.App. 4th Cir. 1991), writ denied 604 So.2d 995 (La.1992). But before such evidence is admissible, the court must find that an agreement or deal was made. Id.
During direct examination by the prosecutor, Williams was asked whether he talked to and cooperated with the police. Williams replied in the affirmative. He was then asked the following questions:
Q Are you here today to tell the truth about all of the incidents that happened on that morning?
A Yes, I am.
Q Did anyone from the State  any attorneys at all  say anything other than to please come here and tell the truth?
A No, they didn't tell me anything else but to tell the truth.
Williams pled guilty on September 13, 1995, which was approximately six weeks after Meyers' trial, to amended charges of attempted manslaughter and simple robbery. Williams was given a suspended sentence of five years at hard labor on each count and was placed on six months active probation.
Meyers fails to provide any evidence, aside from the reduction of the charges against Williams and the sentences that he then received after Meyers' trial, showing that Williams testified against Meyers pursuant to some sort of deal with the State. The above-quoted testimony from Williams does not support Meyers' allegation that Williams testified pursuant to a deal with the State. Meyers fails to provide any evidence that has been discovered since trial revealing a purported deal between Williams and the State; moreover, a review of defendant's cross-examination of Williams does not show that Williams was even asked if he were testifying pursuant to a deal with the State. Therefore, we find that the record is devoid of evidence as to the existence of a deal between Williams and the State or that Meyers was barred from asking about any such deal, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SIX
Meyers has withdrawn this assignment of error.

ASSIGNMENT OF ERROR NUMBER SEVEN
In his seventh and final assignment of error, Meyers complains that the trial court erred in imposing an excessive sentence. A review of the record shows that no oral objection was made to the sentence at the hearing and that no motion for reconsideration of sentence was filed. LSA-C.Cr.P. art. 881.1, subd. D provides *563 that the failure to make or file a motion for reconsideration of sentence shall preclude the defendant from raising an objection to the sentence on appeal. See also State v. Martin, 97-0319 (La.App. 4th Cir. 10/1/97), 700 So.2d 1322. Therefore, appellate review of this issue is precluded, and this assignment of error is without merit.

CONCLUSION
Meyers' convictions are affirmed and his sentence for armed robbery is affirmed. His sentence for attempted second degree murder is vacated, and the case is remanded for re-sentencing on this count in accordance with sentencing guidelines.
CONVICTION AND SENTENCE AFFIRMED. REMANDED FOR RESENTENCING ON ATTEMPTED SECOND-DEGREE MURDER CONVICTION.
NOTES
[1] Meyers filed his motion for new trial on February 12, 1996, alleging that the conviction was against the law and the evidence and that there was new and material evidence. He filed a second motion for new trial in August 1996, alleging that he received ineffective assistance of counsel.