754 So.2d 1111 (2000)
STATE of Louisiana
v.
Ned BIAGAS.
No. 99-K-2652.
Court of Appeal of Louisiana, Fourth Circuit.
February 16, 2000.
*1112 Lynda A. Torry, New Orleans, LA, Counsel for Relator.
(Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge ROBERT A. KATZ).
WALTZER, Judge.

STATEMENT OF THE CASE
Relator was convicted of second degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. His conviction and sentence were affirmed. State v. Biagas, unpub. (La.App. 4 Cir. 2/28/91), 574 So.2d 1312, writ denied, 580 So.2d 377 (La.1991). According to relator's application, the relator filed an application for post conviction relief in the trial court on 8 February 1994 and the trial court denied relief on 17 July 1995. On 16 November 1995 this Court affirmed the trial court's denial of relief. State v. Biagas, unpub. 95-1801 (La.App. 1 Cir. 11/16/95), 662 So.2d 1048, writ denied, 95-3022 (La.2/9/96), 667 So.2d 540. Relator then filed in the trial court a second application for post conviction relief. An evidentiary hearing was held and testimony taken. On 16 September 1999 the trial court denied relief. Relator gave notice of his intent to file for writs and was given a return date of 18 October 1999.

STATEMENT OF THE FACTS
The following is a summary of facts taken from this Court's opinion, State v. Biagas, unpub., pp. 1-2 (La.App. 4 Cir. 2/28/91), 574 So.2d 1312, writ denied, 580 So.2d 377 (La.1991).
Shortly after midnight on July 3, 1988, Leroy Sampson and Monica Cravinas were outside on their porch and relator was across the street on his second story balcony. Sampson called to relator but relator did not reply. Sampson went to relator's balcony and spoke with relator for about fifteen minutes.
Cravinas looked up to see relator and Sampson fighting. Cravinas persuaded a friend, Michael Hayes, to go to relator's balcony to break up the fight. Hayes pulled Sampson off of relator and escorted Sampson home. Relator went inside and Sampson paced on his porch. Sampson gave Cravinas his watch and hat; Cravinas *1113 went inside, but Sampson did not follow. Cravinas looked out and saw relator on his balcony pointing a gun at the alley next to her house. She saw Sampson trying to get back inside the yard through a gate. She heard a round of four to five shots, followed by a round of about twenty shots. Sampson was fatally wounded.
Hayes testified that after the initial blast of gunfire, he saw relator steady the gun on the balcony rail, aim, and fire the second round.
Sampson was dead when police arrived. Officers were told that relator was on the second floor with an Uzi machine gun. They knocked on relator's door, heard a gun clip being loaded, and knocked again. Relator exited with his hands raised and said, "We had a fight so I shot him." Officers found the fully-loaded assault rifle inside and spent casings under relator's balcony.

DISCUSSION
In his application and supplemental brief relator assigns five errors:
1) relator was denied effective assistance of counsel because counsel failed to present evidence and witnesses to establish mitigation to reduce homicide to manslaughter;
2) relator was denied due process because the State withheld evidence favorable to the defense;
3) relator was denied due process through prosecutorial misconduct;
4) evidence was insufficient to prove second degree murder;
5) relator was denied due process by the trial court's erroneous instruction regarding provocation.
It would appear that any application for post conviction relief filed subsequent to State v. Biagas, unpub. 95-1801 (La.App. 4 Cir. 11/16/95, 662 So.2d 1048), writ denied, 95-3022 (La.2/9/96), 667 So.2d 540, would be barred under La.C.Cr.P. art. 930.8. However, the trial court held an evidentiary hearing relating to the second application. In the judgment denying relator's application for post conviction relief, the trial court concluded:
Petitioner Ned Biagas has urged several grounds in support thereof which the court finds to be repetitive and previously litigated. The Court has reviewed the entire record herein and has concluded that petitioner's case was handled in an effective and competent manner, ensuring that Petitioner's constitutional rights were totally and fully protected at each phase of the proceedings.

ASSIGNMENT # 1: INEFFECTIVE ASSISTANCE OF COUNSEL
Relator claims that his counsel did not adequately investigate and present mitigating evidence of: his personal injury, which would have shown heated blood, passion, and provocation; the theft perpetrated on him, which would have negated specific intent; and prior threats made by the deceased victim against him. Relator points to the trial testimony of Officer Rizutto, who mentioned only that the defendant had a scratch on his nose, which could have been contradicted by his medical records and testimony by the emergency medical technicians who treated relator, the witness who saw the relator when he was brought into Central Lockup with a busted nose clogged with blood (according to Ben Smith's 15 August 1997 evidentiary hearing testimony), and the witness who saw and heard Sampson threaten relator for messing with his old lady (according to John Washington's 24 April 1998 evidentiary hearing testimony).
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a relator must show that his counsel's performance was deficient and that the deficient performance prejudiced him. With regard to counsel's performance, the relator must show that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. As to prejudice, the *1114 relator must show that counsel's errors were so serious as to deprive the relator of a fair trial, i.e. a trial whose result is reliable. Id., 466 U.S. at 687, 104 S.Ct. at 2064. Both showings must be made before it can be found that relator's conviction resulted from a breakdown in the adversarial process that rendered the trial result unreliable. Id. If an alleged error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel. State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir.1986). Hindsight is not the proper perspective for judging the competence of counsel's decisions because opinions may differ as to the advisability of a tactic, and an attorney's level of representation may not be determined by whether a particular strategy is successful. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). A claim of ineffective assistance may be disposed of on the finding that either one of the two Strickland criteria has not been met. State v. James, 555 So.2d 519 (La. App. 4 Cir.1989), writ denied 559 So.2d 1374 (La.1990). If the claim fails to establish either prong, the reviewing court need not address the other. State v. Meyers, 97-2584 (La.App. 4 Cir. 11/24/99), 748 So.2d 554.
In writ number 95-K-1801 relator raised the issue of ineffective assistance of counsel. He claimed that trial counsel should have elicited the testimony of the emergency medical technician, who saw the relator's bloody nose; Sandra Evans, the person who rented an apartment from the relator and thought someone had tried to enter it on the night of the incident; Ben Smith, the man at Central Lockup who saw the defendant's injuries; Edmond Brown, the man who saw Hayes steal the relator's truck and burglarize his home after his arrest; and John Washington, the inmate, who witnessed Sampson threaten the relator about messing with his old lady. In that writ relator also argued that his counsel should have introduced medical records to show that he was prescribed pain medication, an antihistamine, and an anti-inflammatory for about one and one-half weeks after the offense. This Court concluded:
Counsel's performance was not deficient. Based on the original opinion of this Court, the record clearly showed Sampson injured relator in a fight prior to the shooting and that evidence was presented to the jury. The testimony of the EMS technician and Ben Smith (who saw relator at Central Lockup) would have merely corroborated an undisputed fact and would not have affected the result of trial. The alleged statements by Sandra Evans concerning her request that relator remain home and by Edmond Brown concerning Hayes' burglary of relator's residence after relator's arrest are irrelevant. There is no evidence the alleged threat which John Washington witnessed from Sampson is connected to this case or that Sampson threatened relator or was armed when relator killed him. Therefore, Washington's statement does not support a justification defense. Counsel's failure to call those witnesses or introduce the medical reports was not deficient and the testimony would not have affected the outcome of the trial.
Biagas, 95-1801, at p. 3. It would appear that for the most part relator is raising the same claims again. This Court already discussed the fact that the defendant had been injured by Sampson in a fight prior to the shooting. This Court discounted the arguments relating to prior threats or relator's injury along with the irrelevant evidence relating to the burglary of relator's home subsequent to the shooting.
To the present application relator attaches copies of the transcripts of the 24 April 1998 and 15 August 1997 evidentiary hearings[1] held subsequent to this Court's opinion in 95-K-1801. At the 24 April 1998 hearing John Washington, the neighbor *1115 whom lived across the street from the victim, Leroy Sampson, in 1987 and 1988, explained that relator also lived across the street from him. He said that he and relator were talking in front of the apartment complex when relator asked him to take a ride to show the vehicle to someone. According to Washington, relator experienced problems with the standard shift, and Washington positioned himself behind the wheel. Sampson stepped out into the street and flagged down the car, and Washington stopped. He said that Sampson told relator that if he saw the relator or heard anything about the relator "talking to his old lady," Sampson would "blow his Fing brains out." Washington stated that he was never contacted by defense counsel during trial, but he would have testified for the relator. Washington admitted a prior incarceration for illegal possession of stolen things. He had been out of prison for about five years.
On cross-examination Washington said that he had never spoken about the incident to relator before the trial. He said that relator knew his name, but he was incarcerated at the time of relator's trial. He never spoke to any members of relator's family prior to trial. The trial court asked Washington if he were there when relator killed Sampson. Washington answered negatively.
According to the 15 August 1997 hearing transcript, Edmond Brown, an inmate, testified that he was renting a house from relator at the time of the homicide. He saw relator and Sampson (he calls him Leroy Stewart) get into a dispute. Relator went downstairs and was talking to Sampson. Then the police arrested relator. Brown said that he then saw Hayes and his brother break into relator's house and take his stereo system and then his Toyota truck. Brown called the police, but no one responded. Brown said that relator's counsel never contacted him.
Thaddeus Biagas, relator's brother, testified that his brother appeared to have been beaten when he saw him at Orleans Parish Prison. Relator said that some guys had tried to rob him. He said that he would have testified for his brother.
Ben Smith, another inmate, testified that he saw relator when he arrived at Central Lockup.[2] Relator had a busted nose clogged with blood. Relator told him that he had been in a fight with two men or two brothers.
Relator testified that he told his attorney that there were witnesses who could corroborate his version of the events. Relator admitted some evidence relating to his injuries and his altercation with the victim was presented. When asked by the trial court, relator stated that he told the booking officer that he had been beaten by the arresting officer.
From this Court's opinion in writ number 95-K-1801 it is clear that in 1995 this Court was aware that the EMT and Ben Smith could have testified to the defendant's injuries, but that fact was not disputed and would not have affected the outcome. It is clear that this Court was aware that Edmund Brown could testify about Hayes' burglary of relator's residence after relator's arrest, testimony that would have been irrelevant. This Court was also aware of John Washington, who heard Sampson's threat to relator, a threat that did not occur immediately before the shooting and did not support a justification defense. Relator had provided the affidavits of Smith, Brown and Washington when he filed writ number 95-K-1801. The testimony from the evidentiary hearing transcripts provides nothing additional, which would cause this Court to reach a different result. Relator's arguments are repetitious and lack merit.

*1116 ASSIGNMENT OF ERROR #2: BRADY MATERIAL

Relator argues that the State failed to turn over evidence of $174.20 found on Sampson after the homicide; relator claims that he received a copy of the supplemental police report with that information almost three years after his trial. Relator alleges that he was not able to show the extent of his injuries to contradict Officer Rizutto's testimony that he suffered a scratch on his nose and to show mitigating evidence. Relator claims that the State failed to disclose statements made to homicide detectives on 3 July 1988 by Michael Hayes that Sampson and relator were arguing over money until years after his trial. Relator claims that he also could have shown that Hayes was a reluctant witness with whom the State set up a fee arrangement for lodging and meals in order to insure his presence at trial.
As a general matter, the discovery articles in the Code of Criminal Procedure impose on a prosecutor in Louisiana a statutory duty to disclose exculpatory evidence to the defendant. La. C.Cr.P. art. 718(A); La.C.Cr.P. art. 719(A); La.C.Cr.P. art. 722. A prosecutor's breach of this duty does not, however, interject constitutional error into the proceedings "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); State v. Willie, 410 So.2d 1019, 1030 (La.1982). A due process violation occurs only when the previously undisclosed evidence, considered "collectively and not item by item," establishes "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434-36, 115 S.Ct. at 1566-67 (citing United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985)). This standard, identical to the test articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for claims of ineffective assistance, also takes into account the totality of the evidence before the judge or jury. Accordingly, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 695-96, 104 S.Ct. at 2069.
State v. Edwards, 99-0911, p. 1 (La.9/24/99), 746 So.2d 1267.
Relator now raises almost the identical claims he raised in writ number 95-1801. He even quotes the first sentence of the following conclusion by this Court (in affirming the trial court's denial of relief):
Disclosure of the allegedly suppressed evidence would not have made a different result reasonably probable. There was no dispute at trial that relator and Sampson were in a physical altercation before the shooting and Sampson injured relator. Moreover, Hayes' statement to police (which relator claims contains exculpatory evidence) also says relator started the fight by punching Sampson in the mouth, Sampson fought back, and that Sampson was unarmed and tried to escape relator's gunfire. That argument has no merit.
Biagas, 95-1801, at p. 4.
Relator then discusses the application of Kyles and states that he "will proceed to expound on the favorable and material character of the suppressed evidence." In its 1995 unpublished opinion this Court discussed the standard under the newly decided Kyles before reaching its conclusion. Relator provides nothing substantially new in the recent application. Relator's arguments are repetitive and have no merit.

*1117 ASSIGNMENT OF ERROR #3: PROSECUTORIAL MISCONDUCT

In his supplemental brief filed on November 29, 1999 relator argues that he was denied due process by virtue of prosecutorial misconduct and points to the State's remarks during rebuttal argument. Relator quotes the same State comments, which were the focus of this Court in writ number 95-K-1801:[3]
And you know, you might thing [sic, think] this is all a game, that, well, here we are, manslaughter or second degree murder. But it's not a game, because it means a lot to a lot of people. It means a lot to Lee Samson's [sic] family. It means a lot to Monica Cravins [sic]. It means a lot to Mike Hayes, a neighbor whose been stuck with this case for a year and a half.
* * *
A manslaughter is when I come home and find somebody in bed with my wife and I take out my gun and I shoot him. Is that what he did? ... Can you imagine what she went through? Standing from here to there watching the person who was the father of her children getting killed in front of her very eyes?
* * *
Well, they got in a fight therefore give him manslaughter. Or, he just had to shoot him a whole bunch of times because he's a crazy man, therefore, give him manslaughter. Or, this fellow had some drinks, therefore, give him manslaughter. Don't do that. Don't do that to his family, to the rest of the State. Don't give him the benefit of that doubt. This is one of the most coldest [sic], most ruthless acts I've seen in two years. Please don't reward him.
In Biagas, 95-1801, this Court quoted the comments in proper order and also quoted the only objection made by defense counsel during the State's rebuttal argument. That objection came immediately after the first quote. The trial court then declared: "That's got nothing to do with the issue here."
Relator does not mention the fact that counsel did not ask for an admonishment after the objection and ignores the fact that there were no other objections during rebuttal argument. He argues that the jurors were wholly diverted from considering a manslaughter verdict by the prosecutor's misstatement of the law as to what constitutes that offense. He argues that the prosecutor made an appeal for sympathy and urged the jury not to give relator the benefit of the doubt. Relator contends that the comments taken singularly may not support a reversal, but taken together they substantially prejudiced relator. He argues that the general jury instructions did not cure the prejudicial effect.
In Biagas, 95-1801, at p. 5-6, this Court declared:
The defense objected when the prosecutor referenced the case's impact on Sampson's family and friends but did not object to the other statements by the prosecutor. Where no objection is made the issue is waived under La. C.Cr.P. art. 841. State v. Ricks, 93-1611 (La.App. 4 Cir. 5/26/94), 637 So.2d 1239, 1242, writ den. 94-1705 (La.11/11/94), 644 So.2d 386, which further states, "The issue of propriety of remarks made during closing argument is not preserved when no objection is made."
The defense did not move for an admonition or mistrial under La.C.Cr.P. arts. 771 and 774. When a trial court sustains an objection to the prosecutor's remarks and the defense fails to request an admonition or mistrial, the defendant *1118 cannot claim the comment was prejudicial. State v. Baylis, 388 So.2d 713, 720-721 (La.1980); State v. Breaux, 598 So.2d 719, 720 (La.App. 4th Cir.), writ den. 609 So.2d 254 (La.1992). That claim has no merit.
Moreover, defendant clearly was not prejudiced by the prosecutor's statements. The trial court instructed the jury on the elements of second degree murder, manslaughter, sufficiency of provocation, and reasonable doubt. Defendant's claim has no merit.
The trial court properly instructed the jury on the elements of manslaughter and second degree murder; the court clearly instructed the jurors that it was their responsibility to determine whether the provocation was reasonable and adequate. The court instructed the jury that it was to receive the law from the court. Although the prosecutor told the jurors not to give relator the benefit of the doubt, the trial court correctly instructed the jurors that it was their sworn duty to give the defendant the benefit of any reasonable doubt.
Relator makes no new argument and provides nothing additional in his recent application. Relator's arguments relating to improper rebuttal argument by the State are repetitious and lack merit.

ASSIGNMENT OF ERROR # 4: INSUFFICIENT EVIDENCE
Relator argues that the evidence presented by the State was not sufficient to prove second degree murder. That argument was fully litigated on appeal and it should not be considered again. La. C.Cr.P. art. 930.4.
This argument lacks merit.

ASSIGNMENT OF ERROR # 5: ERRONEOUS JURY INSTRUCTION
Relator argues that he was denied due process because the trial court gave the following instruction on provocation as it related to manslaughter: "The killing must be the result of the provocation, and the act resulting in death must have been committed at the time of the provocation." Relator does not attach the transcript of the jury charge to show the instruction. In fact relator appears to have copied the instructions given to the jurors when they asked for further instructions on the definition of second degree murder and manslaughter. The original jury charge attached to writ number 95-K-1801 was: "And the killing my (sic) be the result of the provocation, and the act resulting in the death must have been committed at the time of the provocation." Relator argues that the trial court misled the jury into believing that there could be no lapse of time between the provocation and the homicide instead of considering whether relator's blood had cooled at the time of the homicide. However, he does concede that he had the burden of proving that he acted in the heat of passion.
Relator does not mention that the defense did not object to the instruction or ask for a clarification. The failure to contemporaneously object to an alleged error relating to the giving or failure to give jury instructions precludes review of that error. La.C.Cr.P. art. 841(A); State v. Guy, 97-1387 (La.App. 4 Cir.5/19/99), 737 So.2d 231. (La.App. 4 Cir.1999).
Relator also quotes only one sentence of the jury instruction. The sentences preceding the one quoted above were:
One of the lesser but possible verdicts in this case is that of manslaughter. Manslaughter is a homicide which would be murder if the offender had a specific intent to kill or inflict great body (sic) harm, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his-control (sic) or cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

*1119 It is not every provocation that will reduce a homicide to manslaughter; it must be sufficient or adequate (sic) provocation, that is to say, a provocation sufficient to excite an irresistible passion in a reasonable man.
The distinguishing element between murder and manslaughter is the fact that manslaughter is committed in the heat of passion cause (sic) by reasonable provocation. great (sic) provocation resulting in impulsive and uncontrolled action does not excuse the killing altogether, but in recognition of the frailty of human nature, the offense is reduced from murder to manslaughter.
The law in defining manslaughter does not attempt a detail (sic) enumeration of what shall or shall not be considered adequate provocation. The adequacy of the provocation is for the jury to determine. It is for the jury to determine whether the provocation was sufficient to deprive an average person of his self-control and cool reflection.
When the jury wanted further instruction on the definition of second degree murder and manslaughter, the trial court repeated almost verbatim the same instruction as to manslaughter.
Taken as a whole there is no error in the instruction. Regardless, there was no objection to the instruction. This argument lacks merit.

CONCLUSION
There is no error in the trial court's judgment. Consideration of relator's claims are barred under La.C.Cr.P. arts. 930.8 and 930.4, and relator's claims have no merit. Accordingly, we grant certiorari; affirm the judgment of the trial court and deny relief.
WRIT OF CERTIORARI GRANTED; TRIAL COURT JUDGMENT AFFIRMED AND RELIEF DENIED.
NOTES
[1] One of the court reporter's certificates is unsigned.
[2] Although relator also mentions Patrick Slaughter as a person who saw relator's injuries when he entered Parish Prison, Slaughter did not testify at the two evidentiary hearings (according to the transcripts provided).
[3] Relator cites to pages from the rebuttal argument transcript, but does not attach that transcript. The transcript was attached to writ number 95-K-1801. The transcripts have been quoted in their proper sequence instead of the order used in the recent application.