793 So.2d 426 (2001)
STATE of Louisiana,
v.
Albert ALLEN, Jr.
No. 2000-KA-0194.
Court of Appeal of Louisiana, Fourth Circuit.
August 1, 2001.
*428 Hon. Harry F. Connick, District Attorney, Cate L. Bartholomew, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Yvonne Chalker, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JAMES F. McKAY, III, and Judge DENNIS R. BAGNERIS, Sr.
BAGNERIS, Judge.

STATEMENT OF CASE
A bill of information was filed against the defendant, Albert J. Allen ("the defendant"), on June 26, 1998. Count one of the bill charged the defendant with violating La. R.S. 14:94 relative to the illegal use of a weapon. Count two of the bill charged the defendant with violating La. R.S. 14:27/14:64 relative to attempted armed robbery. At arraignment on July 9, 1998, the defendant pled not guilty. On August 19, 1998, the trial court found probable cause and denied the defendant's motion to suppress the identification. Following trial on June 16, 1999, a twelve-member jury found the defendant guilty as charged on both counts.
On July 8, 1999, the court sentenced the defendant to ten years in the Department of Corrections as to each count. The court ordered the sentences to run concurrently with each other. The State filed a multiple bill charging the defendant with being a second felony offender. A motion to quash the bill of information is contained in the record, but there is no indication as to when it was filed. Following a hearing on September 24, 1999, the defendant was found to be a second felony offender.[1] The defendant's previous sentence was vacated, and he was sentenced to serve ten years in the custody of the Department of Corrections pursuant to La. R.S. 15:529.1. The defendant's motion for appeal was filed and granted that same day.

FACTS
The events leading up to the defendant's arrest occurred on April 22, 1998. At trial, the victim, Sidonie Schmidt, described the events that transpired as she was returning from shopping to her home as follows:

*429 .... I came in about ten after four in the afternoon. And (sic) brought in a first load of bags and went back to the car, left the trunk open to get my second load, and crossed a young man as I came out my back gate. And (sic) I think I startled him; I think he startled me. Went (sic) to the back of the car and looked through my trunk, which was open, and saw him take a few steps and turn around, in which case something just told me to run to the street side of the car. And (sic) I looked up and he was holding a gun over the car at me, with a bandana on.
Upon encountering the armed young man, Mrs. Schmidt tried to duck and started to scream. She believed the young man told her to be quiet or shut up. Ordinarily Mrs. Schmidt's husband, Dr. Schmidt, would not have been home at that time of day. However, unbeknownst to Ms. Schmidt, her husband happened to be at home that particular day. Her husband came out the house and lunged at the young man. The man then turned the gun on her husband and told him not to move. The man backed up a distance of about fifty feet. He then shot at her husband about three times. Mrs. Schmidt viewed a photo lineup, but she was not able to make a positive identification of the defendant as the perpetrator. She was able to eliminate five of the six subjects as suspects. However, she was not certain about the sixth person.
Dr. Schmidt testified that he came home early on the day of April 22, 1998, to change his shoes. He was wearing new shoes that hurt his feet. Shortly before 4:00 p.m., he heard the chime on the door from the alarm system. Dr. Schmidt knew his wife had gone to the store, and he assumed she was carrying the groceries into the house. Dr. Schmidt decided to go downstairs to help his wife carry in the groceries. When he walked outside, he heard his wife scream for help. He ran through the gate and saw a black man pointing a gun at his wife. The man was wearing white shorts, a white shirt, and he had a bandana across the lower part of his face. The man was approximately 5'10" or 5'11" tall and weighed 180-190 pounds.
Dr. Schmidt lunged at the man and cursed him. The man then turned the gun on Dr. Schmidt and told him not to move. While Dr. Schmidt was standing there, the man backed off down the street. As the man was backing away, the bandana fell away from his face. When he was fifty to sixty feet away in front of a neighbor's house the man shot at Dr. Schmidt three times.
Dr. Schmidt was not able to identify the man from a photo lineup. He stated that the photographs he was shown were not of good quality. However, when he attended a prior court hearing, he saw the defendant and recognized him as the man who shot at him. At trial, Dr. Schmidt again identified the defendant as the person who fired the shots at him and his wife.
Detective Ronald Livingston of the New Orleans Police Department investigated the incident. He testified that the Schmidts described the perpetrator as a dark skinned male about 5'11" tall and weighing approximately a hundred and ninety pounds. The perpetrator was allegedly clad in white shorts, a white t-shirt, and some red and white Reebok tennis shoes. Mrs. Schmidt stated that there was a bandana partially around the perpetrator's face.
As a result of an anonymous tip, Detective Livingston met with a person who was with the perpetrator when he attempted to rob and fire at the victims. Detective Livingston identified one of the State's exhibits as the clothing given to him by the informant. Detective Livingston stated *430 that the tennis shoes matched the description given by the victims. Additionally, the pants and t-shirt given to him by the informant matched the description given by the victims of what the perpetrator was wearing. The detective identified a photograph of the defendant and the informant as the photograph given to him by the informant. Detective Livingston compiled a photo lineup and showed the photograph to the victims. Dr. Schmidt was unable to make an identification of the suspect. Mrs. Schmidt made a tentative ID of the defendant. She was not sure but she recognized the picture as the suspect. Ms. Schmidt dated and initialed the photo she had selected, and the detective obtained an arrest warrant for the defendant, who was subsequently arrested.
On cross-examination, Detective Livingston stated that Ms. Schmidt said that the perpetrator had on a pair of white shorts, a white t-shirt, red and white tennis shoes and a soldier rag partially covering his face. The detective admitted that the pants presented at trial were not shorts, but he noted that the pants were rolled up, and that when rolled, the pants could be converted to shorts. The detective also admitted that his report had no reference to red Reebok tennis shoes. Rather, he learned through further investigation that the suspect was clad in red tennis shoes. Detective Livingston initially stated that he heard this from the person who was with the defendant. Later, he stated that he probably heard it from Ms. Schmidt. Finally, he admitted that he did not remember who recalled the red Reebok tennis shoes.
Marie Johnson testified that she formerly dated the defendant and was dating him at the time of the incident.[2] Ms. Johnson recalled being in a car with the defendant, her sister, and her sister's baby on April 22, 1998. They were headed to Stein Mart to do some shopping. They planned on spending the defendant's money. However, Ms. Johnson later learned that the defendant had no money. Instead, he had to obtain money from her to buy cigarettes.
Ms. Johnson testified that the defendant was driving down Jefferson Avenue. She recalled that a car passed them, and the defendant remarked that the lady in the back seat of the passing car was his boy's mama. After the car passed St. Charles Avenue, the defendant turned near a school and traveled up a one way street. The defendant slowed down at the corner and started toward a particular house. Ms. Johnson recalled that the car stopped at the stop sign on the corner of the street for a long time. They observed the lady in her trunk; it looked like she was getting something out. The defendant then drove around and parked around the corner from the house. The defendant exited the car, telling them that he was going around the corner to the house of his friend, Timothy Smith. He walked around the corner while Ms. Johnson, her sister, and her sister's baby remained in the car listening to music. Within five minutes Ms. Johnson heard shooting and observed the defendant coming around the corner; he was kind of jogging. Ms. Johnson, who had been talking to her sister, turned around as the defendant arrived at the corner and observed the defendant firing a shot from his gun. He reentered the car, spun the car all the way around the corner and sped off. She asked the defendant what happened, and he told her to shut up. He also told them to stay calm. They rode over to the house of his sister, Barbara. When he arrived at his sister's house he changed his shirt as he watched the news on the television. *431 While at his sister's house, the defendant told them that the man was tripping because he saw a black man. The defendant told her that when the man started coming at him, he started firing.
Ms. Johnson further testified that at the time of the shooting, the defendant was wearing some white jogging suit pants and a white tank top. The pants were balloon pants with a zipper. He also had a soldier rag and was wearing red Reeboks and white socks. She identified clothes presented by the state as the clothes the defendant was wearing that day. She stated that she was the person who gave the clothes to the police. She said that she contacted the police because the defendant kept threatening her.
When asked whether she saw the defendant with a gun that day, Ms. Johnson stated that he still had the gun when they went to his sister's house and when they arrived at her house. When he returned from the house of his cousin, Patrice, he did not have the gun. However, she recalled seeing the gun on the top drawer when she and the defendant visited Patrice's house on the day Patrice was getting married.
Ms. Johnson stated that she and the defendant broke up the day after Patrice's wedding. At Patrice's wedding reception, Ms. Johnson discovered that the defendant was planning to obtain two hundred dollars from her on the first of the month. Then, he was going to tell her he was going somewhere. However, he was not going to return. Upon hearing this, she stated, "before he do it to me I'm going to do it to him." That night after the reception, the defendant was sitting on her porch with his gun on his leg. He told her the police had his car. He also told her that she talked too much because she told her mother what was going on. The defendant told her he was going to shut her up.
Ms. Johnson could not say how long she dated the defendant. She believed she met him a week before Easter. He moved in with her a week after they met because he felt his family was, "going against him". He lived with her two to three weeks. The defendant told her his name was Albert Adams. Ms. Johnson admitted that she had a prior conviction for forgery in December of 1993.
The defendant's older sister, Barbara Brewer, stated that she only knew Marie Johnson by name. She had never met or spoken to Ms. Johnson, and Ms. Johnson had never visited her home. Mrs. Brewer stated that the defendant was the youngest of six siblings. She always took care of him, and she did not want to see anything bad happen to him. However, she stated that she would not lie for her brother. Ms. Brewer had no knowledge of the defendant's whereabouts on April 22, 1998.
Patrice Lewis, the defendant's cousin, testified that she knew Marie Johnson; however, she had not known her for long. Ms. Lewis stated that she only met Ms. Johnson a couple of times and had played cards with her. However, Ms. Johnson never visited her home.
Ms. Lewis initially testified on direct examination that she did not know what the relationship was between Ms. Johnson and the defendant. However, during cross-examination, Ms. Lewis stated that Ms. Johnson and the defendant dated for a while. Ms. Lewis had no knowledge of the defendant living with Ms. Johnson for awhile. She stated that the defendant lived with his wife on Clara Street. Ms. Lewis had never seen the defendant with a gun.
Ms. Lewis further stated that she remembered April 22, 1998, because she was getting married around that time. She initially testified that she saw the defendant *432 around 3:00 at the wedding rehearsal, which she believed took place on a Thursday. However, she later admitted on cross-examination that she was not sure of the day she saw the defendant.
Yvette Allen, another of the defendant's sisters, stated that she had only seen Marie Johnson twice. She initially said Ms. Johnson never came to her house. Then she stated that the first time she met Ms. Johnson was when the defendant took Ms. Johnson to her house in April and introduced Ms. Johnson to her on the porch. She knew nothing about a relationship. She could not remember anything happening on or about April 22, 1998. She did not see the defendant with a gun and the defendant did not come to her house and change clothes on or about April 22, 1998. The defendant did not live with her. To her knowledge, he stayed on Clara Street.
The defendant, Albert Allen, testified that he knew Marie Johnson for three weeks; he had an affair with her. The defendant denied ever pulling a gun on Dr. Schmidt or Mrs. Schmidt. He also denied attempting to rob Dr. or Mrs. Schmidt. The defendant insisted that he was not involved in any incident on April 22, 1998.
The defendant also stated that during the time they were together, Ms. Johnson assisted him in many ways. She helped him enroll in college; she helped him get a connection in the music business; and she helped him acquire various things for his little girl. He testified that Ms. Johnson told him that if he ever left her and went back to his wife, she would get him. However he never thought she would try to get him incarcerated for something he did not do.
The defendant denied ever telling Ms. Johnson that he was leaving his wife. He told her that he and his wife were having some problems because his wife was pregnant and grouchy. During that time he and his wife had an on and off relationship. His wife stayed at the house, and he stayed at his sister's house on Clara Street. The defendant denied ever moving in with Ms. Johnson.
The defendant testified that Ms. Johnson's testimony that she gave the defendant's red shoes to the detective was not true. He stated that he gave the red Reebok shoes to the detective on the day he was arrested.
The defendant testified that on April 22, 1998, he was at University Hospital from 8:00 or 8:30 that morning until 2:30 or 3:00 that evening. His daughter was born on April 18 with a heart murmur and subsequently had to undergo emergency surgery. The medical care workers did not know if it was going to be necessary to transport his daughter to Texas for a surgical procedure. Both the defendant and his wife had to be present at the hospital on April 22, 1998. He left the hospital around 2:00 or 3:00 and went to Patrice's wedding rehearsal. The defendant stated that the wedding rehearsal took place on a Tuesday. After the rehearsal, he returned to the hospital. The defendant insisted that he was not with Ms Johnson at all on the day of April 22, 1998.
The defendant denied ever threatening Ms. Johnson or pointing a gun at her. He stated that Ms. Johnson was the one who stated that if he ever tried to leave her she would get back at him. The defendant stated that when he and his wife were having difficulties, his wife stayed with his sister. The defendant testified that he was approximately 5' 11" or 6' tall and weighed 170 to 175 pounds.

ERRORS PATENT
A review of the record for errors patent reveals several errors.
*433 The first error patent concerns a defective bill of information. La.C.Cr.P. art. 464 provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
Pursuant to the above cited article, the bill of information must contain all the elements of the crime intended to be charged in sufficient particularity to enable the defendant to prepare for trial, to allow the court to determine the propriety of the evidence which is submitted upon the trial, to impose the correct punishment on a guilty verdict, and to afford the defendant protection from double jeopardy.[3]State v. Ordon, 96-1710 (La.App. 4 Cir. 7/16/97), 697 So.2d 1074; State v. Finch, 31,888 (La.App. 2 Cir. 5/5/99), 733 So.2d 716, citing State v. Comeaux, 408 So.2d 1099 (La. 1981).
In the instant case, the bill of information charged the defendant with violating La. R.S. 14:94, which provides in relevant part:
§ 94. Illegal use of weapons or dangerous instrumentalities
A. Illegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being.
B. Except as provided in Subsection E, whoever commits the crime of illegal use of weapons or dangerous instrumentalities shall be fined not more than one thousand dollars, or imprisoned with or without hard labor for not more than two years, or both.
* * * *
E. Whoever commits the crime of illegal use of weapons or dangerous instrumentalities by discharging a firearm from a motor vehicle located upon a public street or highway, where the intent is to injure, harm, or frighten another human being, shall be imprisoned at hard labor for not less than five nor more than ten years without benefit of probation or suspension of sentence.
F. Whoever commits the crime of illegal use of weapons or dangerous instrumentalities by discharging a firearm while committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit a crime of violence or violation of the Uniform Controlled Dangerous Substances Law, shall be imprisoned at hard labor for not less then ten years nor more than twenty years, without benefit of parole, probation, or suspension of sentence....
The above-cited statute contains three possible methods of committing the offense and provides three different degrees of punishment for each method. Count 1 of the bill of information merely stated that the defendant, on the 22nd day of April 1998, "intentionally or criminally negligently discharged a firearm where it was foreseeable that it might result in death or great bodily harm to a human being." The wording of the language in the bill is consistent *434 with the wording found in La. R.S. 14:94 A. However, the penalty for violating subsection A is a fine of not more than one thousand dollars, or imprisonment with or without hard labor for not more than two years, or both. In the instant case the trial court sentenced the defendant to serve ten years in the Department of Correction on the illegal use of a weapon charge. The sentence suggests that the defendant was actually tried and convicted for violating subsection F, which, in relevant part, prohibits the discharging of a firearm while committing or attempting to commit a crime of violence.
The conclusion that the defendant was actually tried for violating subsection F is supported by other documents in the record. Although the responsive verdict form merely indicates that the defendant was found guilty as charged of illegal use of a weapon, the form makes reference to a violation of La. R.S. 14:94(F) as well. Likewise, the record contains a copy of the screening action form of June 3, 1998. The form indicates that the charge was accepted under La. R.S. 14:94 F. However, an essential element of a violation of paragraph F is that the offender discharges the weapon while he is committing or attempting to commit a crime of violence. The bill of information contains no language to place the defendant on notice that he is being charged with discharging a weapon while committing a crime of violence. From reviewing the record, it is unclear when or if the defendant was placed on notice that he was being tried under subsection F.
Technical insufficiency in an indictment may not be raised for the first time after conviction where the indictment fairly informed the accused of the charge against him and the defect does not prejudice him. State v. Michels, 98-608 (La. App. 5 Cir. 1/13/99), 726 So.2d 449. Thus, in cases where the wording of the bill of information is such that the defendant shows no prejudice or surprise, the information will be deemed sufficiently clear. State v. Sims, 426 So.2d 148 (La.1983). La.C.Cr.P. art. 464. Further, omission of essential facts from an indictment or bill of information is not necessarily prejudicial error because such facts can be given through responses in a bill of particulars. State v. Benedict, 607 So.2d 817, 821 (La. App. 1 Cir.1992), citing State v. Authement, 532 So.2d 869, 873, (La.App. 1 Cir. 1988). For these reasons, a defendant ordinarily cannot complain of the insufficiency of an indictment or bill of information after verdict unless it is so defective that it does not set forth an identifiable offense against the laws of this state and inform the defendant of the statutory basis of the offense. Id.
In the instant case, the defendant waived the reading of the bill of information, and it does not appear that he requested a bill of particulars. While a general motion for discovery and inspection was made, a copy of the response to that motion is not found in the record. Because the language of the bill tracked the language of subsection A of La. R.S. 14:94 verbatim, the defendant could reasonably have believed that he was being charged under subsection A, and he could have reasonably concluded that no additional information concerning the charge was needed. This is particularly true since the defendant was also being charged with attempted armed robbery in count two of the same bill of information.
However, the failure to specify that the defendant was being charged of violating subsection F of La. R.S. 14:94 appears to have prejudiced the defendant in that he was sentenced under the most punitive subsection of La. R.S. 14:94. In State v. Ainsworth, 528 So.2d 599 (La.App. 2 Cir. *435 1988), the court concluded that the State v. James, 305 So.2d 514 (La.1974) approach was not applicable to cases involving defects in a bill of information that affected the sentencing exposure. Such a defect was considered substantial in that the defendant was billed in such a way that he could not know the precise charge lodged against him. The court noted that the underlying problem with the lack of notice as to sentencing exposure is the constitutional mandate that the defendant be informed of the nature and cause of the accusation. The problem was exacerbated in Ainsworth, where the defendant entered a guilty plea. However, it is equally true in the instant case wherein the defendant was aware of the fact that he was also being charged in a separate count with the attempted armed robbery offense. He could have reasonably concluded that the separate count was being pursued under subsection A. This type of defective bill of information is recognizable on appeal as an error patent discoverable by a mere inspection of the pleadings. State v. Ordon, 96-1710 (La.App. 4 Cir. 7/16/97), 697 So.2d 1074.
The next error patent concerns double jeopardy. This court has previously recognized the violation of a defendant's double jeopardy rights as an error patent. State v. Thomas 99-2219 (La.App. 4 Cir. 5/17/00), 764 So.2d 1104, 11081109; State v. Ashford, unpub., 90-0301 (La.App. 4 Cir. 5/16/91), 579 So.2d 532.
The Double Jeopardy Clause protects defendants from being punished or prosecuted twice for the same offense. U.S. Const. amend. V; La. Const. art. I, § 15; La.C.Cr.P. art. 591.
Code of Criminal Procedure article 591 provides that
[n]o person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant.
Article 596 of the Code of Criminal Procedure sets forth the requirements for double jeopardy:
Double jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial. (emphasis added)
The above cited article speaks of double jeopardy in terms of a second prosecution for the same offense, but its provisions also protect an accused from multiple punishments for the same criminal conduct. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); State v. Vaughn, 431 So.2d 763 (La.1983); State v. Edward, 98-2932 (La.App. 4 Cir. 5/3/00), 761 So.2d 662.
Louisiana uses both the "Blockburger test" and the "same evidence test" in determining whether double jeopardy exists. La.C.Cr.P. art. 596; State v. Vaughn, supra. The "Blockburger test" was set out by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), where the court stated:
The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, *436 the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.
The "same evidence test" has been adopted by the Louisiana Supreme Court and was explained by the court in State v. Steele, 387 So.2d 1175,1177 (La.1980), as follows:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial ...
The `same evidence test' is somewhat broader in concept than Blockburger, the central idea being that one should not be punished (put in jeopardy) twice for the same course of conduct.
Although recognizing these two separate tests, the Louisiana Supreme Court, in recent years, has principally relied on the "same evidence test" when evaluating double jeopardy claims. State v. Miller, 571 So.2d 603 (La.1990).
In State v. Harris, 98-2932 (La.App. 4 Cir. 5/3/00), 761 So.2d 662, the defendant was charged and convicted of distribution of cocaine and possession of a firearm while distributing cocaine. This court vacated the defendant's conviction and sentence for possession of a firearm while distributing cocaine, finding a double jeopardy violation. This court noted that the defendant's conviction for possession of a weapon while distributing cocaine required the use of the same evidence needed to convict the defendant of distribution of cocaine.
In the instant case, the defendant was prosecuted and convicted of illegally discharging a firearm while committing a crime of violence and for attempted armed robbery. A review of the record leads to the inescapable conclusion that the attempted armed robbery is the "attempted crime of violence" in the illegal discharge of a weapon conviction. Subsection F of La. R.S. 14:94 imposes criminal penalties when one illegally uses a weapon by "discharging a firearm while ... attempting to commit ... a crime of violence." Thus, in order to prove a violation of La. R.S. 14:94(F), the State was required to prove the defendant was committing the attempted armed robbery at the time of the offense. Because the attempted armed robbery was an element of the offense of illegal discharge of a firearm while committing a crime of violence, the double jeopardy clauses of the United States and Louisiana Constitutions were violated.
However, it should be noted that an accused who commits separate and distinct offenses during the same criminal episode or transaction may be prosecuted and convicted for each offense without violating the principles of double jeopardy. State v. Nichols, 337 So.2d 1074 (La.1976). Arguably, the evidence could support a finding that the attempted armed robbery was completed before the defendant ventured upon a new course of conduct of trying to shoot the Schmidts. Dr. Schmidt and Mrs. Schmidt testified that when Dr. Schmidt appeared on the scene, the defendant told them to remain still as he backed down the street. It was not until the defendant had traveled approximately fifty feet that he began to fire the gun.[4] This scenario suggests that the double jeopardy prohibition would not *437 necessarily be violated as the offenses could be considered separate acts.
However, if such was the case, it appears the defendant could not lawfully be charged and convicted of violating La. R.S. 14:94(F) which seems to require that the discharge of the weapon occur while the person is in the act of committing a crime of violence. Yet, the record supports a finding that the defendant was actually prosecuted for violating subsection F of La. R.S. 14:94.
The bill of information is defective insofar as it fails to specify that the defendant is being charged under paragraph F of La. R.S. 14:94. Further, it appears this failure prejudiced the defendant. Ordinarily the remedy for a defective bill of information wherein prejudice is shown is reversal of that conviction. However, because the record also reveals that the attempted armed robbery charge was the crime of violence upon which the illegal discharge of weapon charge was based, a double jeopardy violation also occurred. The remedy for a double jeopardy violation is to vacate the conviction and sentence of the less severely punishable offense and to affirm the conviction and sentence of the more severely punishable offense. State ex rel. Adams v. Butler, 558 So.2d 552 (La.1990).[5] Accordingly, the defendant's conviction and sentence for illegal possession of a weapon while committing a violent crime is hereby vacated.
The next errors patent is a sentencing error. Because the conviction and sentence must be vacated because of the double jeopardy violation, a discussion of this particular error is pretermitted.

ASSIGNMENT OF ERROR NUMBER 1
In the first assignment of error, the defendant argues that the evidence was insufficient to support a verdict for attempted armed robbery.
This court set out the standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La. App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.

*438 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
The defendant alleges that the State failed to prove identity beyond a reasonable doubt on both counts listed in the bill of information. The defendant argues that Mrs. Schmidt was never able to positively identify him; that Dr. Schmidt's identification was unreliable; and that Ms. Johnson's testimony placing him in the vicinity of the crime was not credible because she "had an axe to grind" with him.
Mrs. Schmidt admitted that she could not positively identify the defendant as the perpetrator. However, shortly after the incident occurred, she was able to eliminate five suspects from a photo lineup that Officer Livingston showed her. However, she was not able to eliminate the defendant. Dr. Schmidt, while unable to identify the defendant from the photo lineup, immediately recognized him as the perpetrator at an earlier hearing in the case. Ms. Johnson, the defendant's former girlfriend, placed the defendant in the vicinity where the incident occurred and further testified that she personally observed the defendant fire the third shot. The jury was made aware of the fact that Ms. Johnson may have had "an axe to grind" with the defendant. Nevertheless, the jury heard from Ms. Johnson and the defendant and resolved the credibility issue in favor of Ms. Johnson. This Court cannot second guess the jury on credibility issues.
Next the defendant argues that the State did not prove the elements of the crime of attempted armed robbery beyond a reasonable doubt.
In order to obtain a conviction, the State must prove the elements of the crime beyond a reasonable doubt. La. R.S. 14:27 defines attempt as follows:
§ 27. Attempt
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
Armed robbery is defined in La. R.S. 14:64 as follows:
§ 64. Armed robbery
A. Armed robbery is the taking of anything of value belonging to another *439 from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
The defendant argues that the State failed to meet its burden of proving the defendant intended to take something of value from the possession or immediate control of Ms. Schmidt. The defendant notes that even though he pulled out a gun, there was no evidence that he demanded anything of value from Mrs. Schmidt or that Mrs. Schmidt possessed anything of value at the time of the assault. Citing State v. Stone, 615 So.2d 38 (La.App. 3 Cir.1993), the defendant argues that his conviction should be reversed because there was no overt act to demonstrate his specific intent to commit an armed robbery.
The facts of this case are vastly different from the facts in State v. Stone, supra, where the defendant, after conversing with the clerk at a store located in a gas station, pulled a knife on the clerk and cut her neck. The Third Circuit noted that although the defendant had gathered several items off the shelves and placed them on a counter in the store, there was no overt act to show the defendant intended to take the items. The court noted that the store video revealed that the defendant did not attempt to leave with the items; nor did she say or do anything revealing a desire to take anything of value. Further, the court noted that the attack occurred away from the cash register. The court noted that the store clerk never testified that the defendant demanded anything of value. The court discounted the fact that the defendant had no money on her, noting that she may have been in possession of a credit card. The court hypothesized that the defendant's sudden attack could have been an enraged response to some imagined provocation by the store clerk in the prior verbal exchange.
The facts of this case are similar to the facts of State v. Stone in that there is no evidence that the defendant demanded anything of value from the victim. Rather, when asked if the perpetrator asked for anything, Mrs. Schmidt replied, "No. I don't believe there was much time though. My husband came quickly." However, Mrs. Schmidt stated that she assumed that when a person holds a gun on you, they want something. Mrs. Schmidt's assumption appears to be reasonable in that the defendant pointed a gun at her while she was attempting to remove a second load of groceries from her vehicle. When she started screaming, the defendant told her to shut up. Because her husband immediately appeared on the scene, the defendant did not have any opportunity to tell Mrs. Schmidt why he pulled the gun on her.
This case is very similar to State v. Davis, 93-0663 (La.App. 4 Cir. 2/25/94), 633 So.2d 822, where the defendant walked up behind the victim and pointed a gun toward her head. One of the victim's companions, who had been walking a short distance behind her, observed what was happening, shouted and grabbed the defendant. At trial, the victim testified that she was unaware that the defendant had pointed a gun at her until after her companion told her. Further, she testified that she did not recall anyone asking for her purse or jewelry; she admitted nothing was taken from her. Rather, the perpetrators ran from the scene when a security guard arrived. This Court rejected the defendant's argument that the State failed to prove he intended to rob the victim stating:
Specific intent may be inferred from the circumstances of a transaction and from the action of the accused. State v. *440 Graham, 420 So.2d 1126, 1127 (La.1982). Further, specific intent is a legal conclusion to be resolved by the fact-finder. Id., at 1128.
In the present case, the victim, Bill Burgstiner, testified that while walking in the restaurant parking lot he observed defendant exit a vehicle and point a gun to the head of his companion Karen Woods. Although Ms. Woods did not hear defendant demand anything of value from her, it is undisputed that defendant was armed with a dangerous weapon within a few feet of Ms. Woods and his action in pointing the gun to Ms. Woods' head is clearly an act tending directly toward defendant's objective of robbing Ms. Woods.

The defendant was tried by a twelve member jury of his peers. We think it quite reasonable for the jury to infer from the circumstances presented that defendant intended to commit an armed robbery of Ms. Woods and her companions. Viewing all the evidence in a light most favorable to the prosecution, we find the evidence presented on the armed robbery charge is clearly sufficient to sustain defendant's conviction. (emphasis added)
State v. Davis, 93-0663, pp. 4-5, 633 So.2d at 825-826
The State submitted sufficient information from which the jury could have reasonably concluded the defendant intended to rob Mrs. Schmidt.

ASSIGNMENT OF ERROR NUMBER 2
In the second assignment of error, the defendant argues that the trial court erred in adjudicating the defendant a second felony offender when there was no evidence of a contemporaneous waiver of constitutional rights during the defendant's adjudication of juvenile delinquency.
The Docket Master and the minute entry of 9/24/99 contain statements indicating that the State filed a multiple bill against the defendant. Additionally, the transcript of the multiple bill hearing of September 24, 1999 is contained in the record. A review of that transcript also reveals that a multiple bill was filed and various exhibits were admitted at the hearing, including a set of legal documents from the Juvenile Court case titled In the Interest of Albert Allen Jr. However, both the defendant and the State admit that neither the multiple offender bill of information, nor the supporting documents are contained in the appellate record. Accordingly, it is not possible for this Court to address the issue of whether the State submitted sufficient information to show a valid waiver of constitutional rights in the juvenile delinquency proceedings. Therefore, the defendant's adjudication and sentence as a multiple offender is hereby vacated, and the original sentence is hereby reimposed.

CONCLUSION
The defendant's conviction for violating La. R.S. 14:94 F should be reversed and the sentence vacated because of the double jeopardy violation. The defendant's attempted armed robbery conviction should be affirmed. His adjudication and sentence as a multiple offender should be vacated, and his original sentence should be reimposed.
CONVICTION REVERSED, AND SENTENCE VACATED; CONVICTION AFFIRMED; MULTIPLE OFFENDER SENTENCE VACATED; ORIGINAL SENTENCE REIMPOSED.
NOTES
[1] The minute entry erroneously states that the defendant pled guilty to the multiple bill.
[2] Ms. Johnson testified that her married name was Marie West.
[3] La. C.C.P. art. 461 provides in relevant part, "Indictment" includes affidavit and information, unless it is the clear intent to restrict that word to the finding of a grand jury.
[4] Also, see, State v. Sparks, unpub., 96-0411 (La.App. 4 Cir. 12/4/96), 684 So.2d 91.
[5] Also, see, State v. Duplessis, unpub., 94-2106 (La.App. 4 Cir. 10/26/95, 662 So.2d 1047)