968 So.2d 1102 (2007)
STATE of Louisiana
v.
Danny GALINDO.
No. 2006-KA-1090.
Court of Appeal of Louisiana, Fourth Circuit.
October 3, 2007.
*1105 Eddie J. Jordan, Jr., District Attorney of Orleans Parish, David S. Pipes, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellee.
Laurie A. White, Autumn Town, Laurie White & Associates, LLC, New Orleans, LA, and Gary Bizal, Pierce & Bizal, New Orleans, LA, for Defendant/Appellant.
Court composed of Judge JAMES F. McKAY III, Judge LEON A. CANNIZZARO JR., and Judge ROLAND L. BELSOME.
JAMES F. McKAY III, Judge.
STATEMENT OF THE CASE
On January 10, 2005, the State filed a bill of information charging the defendant-appellant Danny Galindo with one count of violating La. R.S. 14:43.1 relative to sexual battery. The defendant entered a not guilty plea at his arraignment on January 19, 2005. On April 19, 2005, the defendant was tried and convicted by a six-person jury. On April 22, 2005, new counsel enrolled, and on May 6, 2005 a motion for new trial was filed. The trial court denied the motion on May 19th. After hearing testimony on August 19, 2005, the court sentenced the defendant to serve six years at hard labor and ordered that he comply with the sexual offender registration law. The defendant subsequently filed a motion to reconsider sentence which was denied by the trial court on August 26, 2005. On the same date, the court amended the defendant's sentence to direct that it be served without the benefit of probation, parole, or suspension of sentence.
*1106 Although the trial court had granted the defendant's motion for an appeal on August 26, 2005, the intervention of Hurricane Katrina resulted in a lack of notice for the appeal. Therefore, on April 17, 2006, counsel filed a motion requesting notice of appeal and the setting of a new return date. The appeal was subsequently lodged on August 17, 2006. This appeal follows.
STATEMENT OF THE FACTS
M.M. and E.M., eight-year old girls, were friends from school who often played together. E.M., the victim, lived with her grandparents, her mother, and her stepfather in a residence which was next door to the defendant's home. The two girls often played at E.M.'s house and sometimes they played inside the defendant's home. On one occasion, M.M. saw the defendant touch E.M.'s posterior. M.M. subsequently told her mother, G.K., about the incident. Because E.M.'s mother, E.H., was out of town, G.K. did not tell E.H. about what she was told until a few days later. According to her trial testimony, G.K. told E.H. that M.M. said that, while the girls were playing at the defendant's home, E.M. took off her pants and was jumping on the bed; when she lay down, the defendant lifted up her legs and "blew a raspberry on her butt."
After G.K. had informed E.H. of what M.M. said, E.H. asked her daughter E.M. about whether the defendant had ever done anything to her that was not right. E.M. began to cry and told her mother a story which differed from that related to G.K. by M.M. The victim said that the defendant pulled down her underwear and touched her "private area." When her mother asked how many times this occurred, E.M. said that it was more times than she could count.
E.H. testified at trial that she and her husband, E.M.'s stepfather, had been good friends with the defendant and his wife. The couples socialized at gatherings, attended movies together, and also E.H. and Stacy Galindo, the defendant's wife, loaned each other clothes to wear. The Galindos owned a dog, which E.M. loved, and the defendant would invite E.M. to go walk the dog almost daily; sometimes Stacy asked her to go also. E.M. liked to go to the defendant's house to play with the dog and occasionally went there with her friend M.M.E.H. testified that she always assumed that her daughter was playing with the defendant's dog when she was at his house and was unaware that she was playing with the defendant. However, she knew that E.M. would often go to the defendant's house to have Kool-Aid after walking the dog. E.H. denied that her daughter ever spent more than fifteen minutes at the defendant's house at a time, stating that she tried not to let her stay very long so that the defendant and his wife would not be bothered.
After E.H. learned of the sexual abuse, she contacted the police and spoke with Detective Coulon. The detective arranged for E.M. to be examined at Children's Hospital. Dr. Ellie Wetsman, who was qualified as an expert in pediatric medicine including the treatment of pediatric sexual abuse, testified at trial that she examined the victim which examination included obtaining a history. E.M. told the doctor that she had been touched in the genitals, specifically the vagina, and possibly the anus, by "Danny" who used his hand and his mouth. The physical examination was negative for any evidence of injury, which was consistent with the history given by the victim.
Detective Kurt Coulon testified at trial that he was assigned to the Child Abuse Unit on July 31, 2004 and investigated an alleged molestation on Homedale Street. He interviewed the victim and her mother. *1107 The victim cried while he was asking her what happened. Detective Coulon arranged for E.M. to go to the Child Advocacy Center to document her statement by video and audiotape; a forensic interviewer took the statement with no one else present in the room. After the statement was taken, Detective Coulon obtained an arrest warrant for the defendant. The videotape of E.M.'s statement was played for the jury.
On cross-examination, Detective Coulon was asked if there was ever any statement from the victim or her mother about the defendant, prior to the videotaped statement, about the defendant blowing a "raspberry" on the victim's anus. The detective stated that there was not, nor was there any reference to this on the tape. Instead, the victim on the tape merely said that the defendant walked into the room, pulled down her pants and touched her vagina. However, at the time Detective Coulon prepared the arrest warrant, he included a separate charge of oral sexual battery based upon the defendant having placed his mouth on the victim's anus. In further testimony, the detective agreed that, according to the victim's videotaped statement, it was M.M. who was running around the defendant's house naked, not the victim.
E.M. testified that she lived next door to the defendant. She liked to play with his dog and take him for walks. Sometimes she would walk the dog alone, sometimes with Stacy, the defendant's wife, or with the defendant. She also would go into the defendant's house, sometimes alone and sometimes with her friend M.M. She testified that the defendant touched her "private" in his bedroom. She said that it happened more than once. He used his hand to touch her. When it happened she was lying down on the bed on her back. During cross-examination, E.M. said that the defendant always touched her in the same way and that he never did anything more than touch her and walk away. She also said that the defendant "blew a raspberry on her butt", and then she admitted that she told the assistant district attorneys the day before trial that she made that up. She said that she had gotten confused. She further testified that the night before trial she spoke with her mother about her testimony and her mother told her to tell the court that the defendant did blow a "raspberry" on her behind.
In further cross-examination, E.M. said she usually stayed at the defendant's house for around an hour. She said sometimes her mother came to get her and other times the defendant and/or his wife would tell her that it was time for her to go home. E.M. said she continued to go to the defendant's home after he touched her and that she was not afraid to go there. Also, E.M. said she looked forward to being allowed to spend the night at the defendant's house with his niece Casey, but she had not done so yet.
On redirect, E.M. testified that the defendant would pull her pants down before touching her.
The defense called several witnesses at trial. R.M., the victim's grandfather, was asked whether he had desired to purchase the defendant's house for his daughter and her family, which he denied. He was also asked if he knew another neighbor, Shelley Ruiz, and what conversations they had about the allegation against the defendant. R.M. stated that he told Ms. Ruiz what the defendant had done and how upset the family was. R.M. testified that he may have made comments that he wished the Galindos would move.
C.M., the victim's grandmother, testified that the victim was not allowed to go outside without an adult present. She said that, as far as she knew, the victim never *1108 went to the defendant's house by herself. She stated, however, that she worked each day until 5:00 p.m. C.M. explained that, when E.M. was not in school, she might have been with C.M.'s younger daughter, who was sixteen, or at her other grandmother's day care center until her mother or stepfather picked her up after work. C.M. further explained that E.M. went to an after school program at her elementary school, and that she was with her aunt or other grandmother on days when there was no school. According to C.M., the victim was not home on school day afternoons until 4:30 or 5:00, although sometimes E.M.'s mother got off work earlier and picked E.M. up from school. In further testimony, C.M. stated that she relayed the allegations against the defendant to her neighbor Shelley Ruiz and Ms. Ruiz's girlfriend Kim. Both women were supportive.
Shelley Ruiz testified that she knew the defendant, the victim, and the victim's grandparents. She testified that at approximately 10:15 p.m. one Thursday, the victim's grandparents walked over to her and her partner and told them that they had reason to believe that the defendant had molested E.M. They related that M.M.'s mother had told E.H. about an incident which her daughter had told to her. E.H. then questioned E.M. about it, and E.M. told her that the defendant blew "raspberries" on her and had her disrobe. Ms. Ruiz explained that it was her practice to write down everything, and therefore she had taken notes after her conversation with E.M.'s grandparents. Included in her notes was a statement from R.M. that he would buy the defendant's house for his daughter and E.M. to live in. Ms. Ruiz asked him why he would want to have E.M. live in a house where she was molested. A few days later, C.M. came over to Ms. Ruiz and accused her of having betrayed them and of being a molester like the defendant. C.M. stated that she wished she could press charges against Ms. Ruiz. Ms. Ruiz did not know why C.M. accused her, but was worried and upset because she was a teacher. Ms. Ruiz on cross-examination testified that she tried to make a complaint to the police about the threats from C.M. The police refused to file a report.
In additional testimony Ms. Ruiz stated that, after the defendant was arrested, E.M. several times tried to go to his house when the defendant's sister Michelle was working in the garden.
Stephanie Burlette, the defendant's sister-in-law, testified that she had been at the defendant's house on occasion when E.M. was there. She said she saw E.M. come over unescorted and that while she was there playing with Ms. Burlette's daughter Casey, none of E.M.'s relatives came to check on her. One time E.M. stayed for two or three hours playing with Casey. On another day E.M. and Casey were in a bedroom coloring when Ms. Burlette heard E.M. say that the bedroom was supposed to be her room and that the bedroom where the defendant and his wife stayed was going to be her parents' room. On another day, there was a party at the house for the defendant's birthday. Ms. Burlette noticed that E.M.'s stepfather and grandparents were all there with E.M. However, at some point during the party they left, and E.M. stayed behind. E.M.'s mother was at work that day.
On cross-examination, Ms. Burlette, whose sister was married to the defendant, stated that her daughter Casey often spent time at the defendant's house with him.
The defendant's father, Leonidas Galindo, testified that E.M.'s grandparents were angry when he told them how much the defendant had paid for the house. They said that they had been trying to buy the *1109 house for a long time, but that the owner wanted too much money.
The defendant's wife Stacey Galindo testified at some length. She stated that E.M., her mother, and her stepfather moved in next door in February 2004. Stacey got to know E.M. because of the Galindo's dog Frodo. E.M. loved the dog and wanted to walk him. Stacy and the defendant, who had become friendly with the family, did not mind E.M. going along when the dog was walked. Stacey testified that sometimes she walked the dog and other times the defendant did. She further testified that E.M. often just showed up at their home and came inside. One time, Stacey was in the shower but had left the back door unlocked; E.M. walked in on her saying that she had come to walk the dog. Many times E.M. stayed at the Galindo's house for two or three hours, playing and eating snacks which Stacey bought specifically for her. E.M.'s family members did not come and check on her when she was at the Galindo's home; instead the Galindos would have to send E.M. home. During the school year, E.M. came over to the house late in the day, after 5:00 p.m., when Stacey was home from work. After the allegations were made against the defendant, they moved away because the victim's stepfather and grandfather made threats and followed her when she went to work or walked the dog. By then, she was pregnant, and at the time of trial had given birth to a child.
On cross-examination, Stacey Galindo explained that E.M. often played in an extra bedroom which Stacey had decorated all in pink for her niece Casey. E.M. often played alone, for example by having pretend tea parties. She never played with the defendant according to Stacey. Prior to the allegations against her husband, Stacey had no problems with E.M.'s family; they were wonderful neighbors, and the couples were friendly. She further testified that the defendant was a chef and his schedule varied. Sometimes he worked from 5:30 a.m. until 2:00 or 2:30 p.m., and other times he worked from around 2:00 p.m. until 11:00 p.m.
The final defense witness was the defendant. He testified that E.M. came over to his house by herself frequently. He was generally not alone with her during the school year because he had to be at work at 2:30 p.m. and left home at approximately 1:30 p.m., although occasionally he had off days and would walk the dog with her and allow her to come in the house to play by herself. When she was there, he watched television or played video games. He recalled one incident where he blew a raspberry on her stomach. His wife was home and began tickling him; she told E.M. and M.M. how ticklish he was and the girls started tickling him also. The defendant began tickling them back, and at some point, he picked up E.M. and blew a "raspberry" on her stomach. He stated that he had blown raspberries on other children, such as his niece Casey and his cousins. He said it had nothing to do with sex. In further testimony, the defendant denied that E.M. was ever naked in his house or that he ever touched her vagina. He denied ever engaging in any inappropriate behavior with her.
On cross-examination, the defendant stated that he initiated E.M. walking the dog but that she initiated coming over to the house. He stated that she often would simply come over, knock on the door, and he would allow her inside. Then she would "just go play." If she became a nuisance, he and his wife would simply tell her to go home.
ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error the appellant avers that the evidence was insufficient *1110 to support his conviction for sexual battery. La. R.S. 14:43.1 provides in pertinent part that:
Sexual battery is the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person . . . has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender.
The appellant's argument is not as to the proof of the particular elements of the offense, but rather that the victim's testimony was not credible because she, as well as M.M., gave an inconsistent story, there was a total lack of physical evidence, and the defense put forth evidence to explain why the victim's family had a motivation to fabricate the allegations against him.
The test for determining the sufficiency of evidence to support a conviction was set forth in State v. Armstead, XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 389, 393:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305[sic] La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d 1305; Green, 588 So.2d 757. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
A factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, XXXX-XXXX (La.App. 4 Cir 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432.
In the instant case, the victim testified to the actions of the defendant, specifically that he pulled down her pants and touched her vagina on more than one occasion. E.H., the victim's mother, testified that the victim became very upset and cried when she first asked her about possible inappropriate actions by the defendant. The testimony of G.K. indicated that M.M. was a witness to a least one incident, and M.M. stated that she had told her mother the truth.[1] Although the appellant contends *1111 that there was no physical evidence to support the victim's testimony, the lack of any does not contradict the victim's account. As Dr. Wetsman explained, the lack of physical evidence of molestation was consistent with the history given by the victim.
The appellant also contends that there was conflicting testimony on when the incidents could have occurred. He notes the testimony about the victim's school and vacation schedule and the defendant's work schedule. However, the defendant and his wife both testified that the defendant's work schedule did not prevent him from being home alone in the afternoon on his off-days. Furthermore, the defendant admitted that he was alone in his house with the victim on occasion.
As to the appellant's contention that the victim's grandparents wanted to purchase the house which the defendant owned, there is little support for this in the record. While the defendant's father testified that the victim's grandfather was upset that he was unable to purchase the house, there is nothing to indicate that he influenced the victim into making false allegations against the defendant. In fact, both the victim's family members and the defendant and his wife indicated that the two families were very friendly and socialized without any problems. Stacey Galindo testified specifically that the victim's family were wonderful neighbors, negating any inference that there was animosity about the Galindo's purchase of the house.
The strongest support for the appellant's argument that the evidence was insufficient was the admissions of M.M. and E.M. that, on the day before the trial, they told the prosecutors that the defendant had never blown a "raspberry" on E.M.'s "butt". The girls then indicated at trial that he had. However, the girls were questioned at length about the discrepancies in their statements to the prosecutors and their trial testimony. The jury was able to observe the demeanor of the girls, as well as view the videotaped statement that E.M. had given, and apparently found her credible. Contrary to the appellant's argument, the victim's testimony was not so suspect as to render it invalid. Thus, viewing the evidence in the light most favorable to the prosecution, the jury could legitimately find beyond a reasonable doubt that the appellant committed the crime of sexual battery.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the appellant argues that the bill of information was fatally defective because it did not set forth the elements of the crime, specifically the age of the victim and the alleged acts with a citation to the subsection of La. R.S. 14:43.1.
In State v. Johnson, 2002-254 (La.App. 5 Cir. 6/26/02), 822 So.2d 840, the court addressed this issue as follows:
Defendant has a constitutional right to be advised, in a criminal prosecution, of the nature and cause of the accusations against him. La. Const.1974, art. I, § 13. Code of Criminal Procedure article 464 provides: "The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The Bill of Information must contain all the elements of the crime intended to be charged in sufficient particularity to allow the defendant to prepare for trial, to enable the court to determine the propriety of the evidence that is submitted upon the trial, to impose the appropriate penalty on a guilty verdict, and to protect the defendant from double jeopardy. State v. Allen, 00-0194 (La.App. 4 *1112 Cir. 08/01/01), 793 So.2d 426, 433, citing State v. Comeaux, 408 So.2d 1099 (La. 1981). When the name of the person injured is substantial and not merely descriptive, it shall be stated in the indictment. LSA-C.Cr.P. art. 473.
A defendant may not complain of technical insufficiency in an indictment for the first time after conviction, when the indictment fairly informed the accused of the charge against him and the defendant is not prejudiced by the defect. State v. Michels, 98-608 (La.App. 5 Cir. 1/13/99), 726 So.2d 449. The omission of an essential fact does not necessarily create a prejudicial error because such facts can be supplied during discovery, by a bill of particulars. State v. Allen, supra. For these reasons, after the verdict a defendant ordinarily cannot complain of the insufficiency of a Bill of Information "unless it is so defective that it does not set forth an identifiable offense against the laws of this state and inform the defendant of the statutory basis of the offense." State v. Allen, 793 So.2d 426, 434.
Johnson, pp-3-4, 822 So.2d at 842-43.
In the instant case the defendant did not file a motion to quash or object to the bill of information prior to trial. He also did not file any motion for discovery or a request for a bill of particulars. Instead, the record shows that he was given a copy of the police report at arraignment. Furthermore, the record contains the arrest warrant application, which contains a detailed description of the alleged offense and the age of the victim. Additionally, three weeks after arraignment, a preliminary hearing was held at which Detective Coulon and the victim's mother testified for the State, while the defense presented the victim's grandparents as witnesses. The record indicates that the defendant was well aware of the allegations against him and was in no way prejudiced by the fact that the bill of information did not include the age of the victim or the specific nature of the acts he was alleged to have committed.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER THREE
In his third assignment of error, the appellant argues that he was denied due process and a fair trial when the prosecutors committed misconduct, first by vouching for the credibility of the victim during closing arguments, and secondly by acting unprofessionally during the trial.
As to the first allegation, the appellant cites two comments made during the prosecutor's original closing argument and one comment made during rebuttal. However, there were no objections made to any of these comments. Thus, any error has not been preserved for appeal. See La.C.Cr.P. art. 841.
The second allegation is that the prosecutors acted unprofessionally during the trial by giggling and laughing inappropriately; defense counsel brought their behavior up to the court, thus placing it on the record, and asked that the behavior stop. The court specifically asked if the defense was objecting; counsel replied yes; and the court sustained the objections. However, counsel did not request then a mistrial or that the jury be admonished.
The appellant fails to address the lack of a motion for a mistrial, although he argues that the misconduct denied him a fair trial. A defendant's failure to move for a mistrial bars a defendant from complaining of the trial court's failure to grant a mistrial. State v. Weaver, 99-2376, p. 5 (La.App. 4 Cir. 9/27/00), 770 So.2d 831, 834. Moreover, when the trial *1113 court sustains an objection to the prosecutor's remarks and defense counsel fails to request an admonition or a mistrial, the defendant cannot claim the comment was prejudicial. State v. Dank, 99-0390, pp. 10-11 (La.App. 4 Cir. 5/24/00), 764 So.2d 148, 158; State v. Biagas, 99-2652, p. 11 (La.App. 4 Cir. 2/16/00), 754 So.2d 1111, 1117-18, citing State v. Baylis, 388 So.2d 713, 720-721 (La.1980).
The appellant's third assignment of error was not preserved for review.
ASSIGNMENT OF ERROR NUMBER FOUR
In his fourth assignment of error, the appellant avers that the sentence of six years without the benefit of probation, parole, or suspension of sentence[2] is excessive, arbitrary, capricious, and disproportionate. In support of his argument, he notes the testimony of the multitude of witnesses who testified on his behalf at the sentencing hearing, his total lack of a criminal record, the trial court's refusal to allow a sentencing recommendation from the probation officer who completed a presentence investigation report, and "unusual comments" from the trial court.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, 97-1095 (La.App. 4 Cir. 3/16/99), 727 So.2d 1264; State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2982 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 676. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2982 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
Generally, a reviewing court must determine whether the trial judge adequately complied with the guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La. 1982). If adequate compliance with Art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most *1114 egregious violators of the offense charged. State v. Brogdon, 457 So.2d 616 (La.1984), State v. Guajardo, 428 So.2d 468 (La.1983); Quebedeaux, supra.
The trial court has great discretion in sentencing within the statutory limits. State v. Trahan, 425 So.2d 1222 (La. 1983). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
As noted by the appellant, the trial court heard testimony from twenty-two defense witnesses at the sentencing hearing, although most of the testimony actually consisted of the witnesses reading the letters they had written asking for leniency. Some of the witnesses, Shelly Ruiz, Stephanie Burlette, Stacey Galindo, Leonidas Galindo, and the appellant himself, had also testified at the trial. One of the witnesses, Gary Schwartz, was the defendant's supervisor at his place of employment. Others were family members and friends of the appellant. Much of the testimony painted a picture of the appellant as a generous person who did charity work, stayed away from drugs and alcohol, was loyal to his friends and family, and was involved in his church and community. One of his friends, Heidi Kiesling, testified that she and the appellant along with four other people had been friends from high school. Although some of the group had moved away, she continued to live in Metairie and to see him. She testified that the defendant had spent time with her ten-year old son since his birth and that she had no qualms about allowing him to play with the defendant.
Another witness, Robert Lapole, stated that he had traveled from Texas to testify and that, when he was overseas in the military, he gave the appellant power of attorney over his affairs. Another witness was the Reverend Pedro Nunez, a priest assigned to St. Raphael church. He stated that he had known the appellant and his family for twenty years and that the Galindo family, including the appellant, had been a role model in the Hispanic community.
The appellant's aunt, Maria Torres Couvillion, traveled from Arizona to testify. She stated that she had lived a few houses from the appellant and his family from the time her daughter was one year old until she was eight years old (she was eighteen at the time of the hearing). Mrs. Couvillion denied that there had ever been any indication or allegation that the appellant had molested his cousin. Another witness, Karen DiMartino Launey, who is related to the appellant by marriage, similarly testified that her two young daughters spent time around the appellant and that she never saw any evidence of molestation. She testified she would not hesitate to leave them with him.
At the sentencing proceeding, the State presented three witnesses, the victim's grandparents and mother. The gist of the testimony of the grandparents was their personal feelings of betrayal and anger toward the appellant and his family. The victim's mother testified that the victim had undergone counseling for a year, along with the other family members, and that the victim often asked when the matter would be over. She further testified that the victim had been released from individual counseling just prior to the trial, but was still participating in family counseling. The victim's mother said that she was personally looking mainly for closure, and that she believed a sentence of two to five years would be appropriate.
The appellant contends that the trial court made some unusual comments during the sentencing hearing. First, he notes that the court interrupted the victim's *1115 grandmother, stating that its concern was only the defendant and not the families. The court stated that neither the family of the victim nor the family of the appellant should feel responsible for what occurred. However, given the nature of the testimony being given at the time, the court's comments make perfect sense. C.M. had discussed writing a lengthy letter and her counseling to deal with her anger and loss of trust. However, she referred to feelings of betrayal not only as to the appellant, but also as to his parents, his in-laws, and his wife. Also, prior to C.M. testifying, the victim's grandfather had testified. During cross-examination, defense counsel had asked about his role as a caretaker of his granddaughter and whether the victim was allowed to go over to the appellant's house unsupervised. Thus, the trial court was obviously being given evidence, which inferred the fault of the victim's caretakers. It does not appear unusual that the court would proactively attempt to keep the focus of the sentencing hearing on the appellant only.
The appellant also complains that the trial court stated for the record that it was its policy not to allow the probation officer to recommend a sentence in the presentence investigation report. However, the court explained that it felt it was the role of the court to determine the sentence. This view of the court's role did not impact the ultimate sentence, which the court chose to impose.
After hearing all the testimony at the sentencing hearing, the court expounded at length on what it considered important in its sentencing decision. First, the court stated that it accepted the jury's verdict. The court then discussed how difficult these types of crimes were to determine sentencing because "the persons involved usually have no record or there is no record of violence. They're persons who are known and respected in the community." The court then stated that its focus was on the victim, and that toward that end the court had reviewed the videotape of the victim's statement after the trial, in the presence of counsel.[3] The court stated that it found the tape compelling; the court already felt that the testimony of the victim and her friend at trial was "very, very compelling." Finally, the court stated that it was taking into consideration the fact that the appellant had a wife, a young child, and a very loving family, but nevertheless, that there were recurring acts against a young and vulnerable victim for which the law provided special protection. The court then imposed a mid-range sentence of six years.
Considering that the court had the benefit of a presentence investigation report, conducted a lengthy sentencing hearing, and gave extensive reasons for its sentencing decision, there is no basis to find that the court abused its discretion. Nevertheless, the appellant suggests that the sentence imposed is disproportionate and excessive by citing to cases involving more egregious factual situations but where the defendants received similar or lesser sentences. However, the appellant does not mention other cases wherein the defendants received similar sentences. For example, in State v. Taylor, 95-179 (La.App. 3 Cir. 10/4/95), 663 So.2d 336, the defendant, a first felony offender, received consecutive sentences of eight years for sexual battery and three years for attempted indecent behavior with juvenile, *1116 and the court found the sentences were not excessive.
In State v. Badeaux, 01-0406 (La.App. 5 Cir. 9/25/01), 798 So.2d 234, maximum consecutive sentences for sexual battery and indecent behavior with a juvenile were upheld. The court noted the trial court's reliance on the factors of the severity of the crime, the vulnerability of the child victim, who was fourteen, and the use of the defendant's position as an adult neighbor to commit the offense. The court rejected the defendant's argument that his status as a first felony offender with a history of mental illness should militate against the maximum sentences; the court also held that the trial court adequately justified imposing consecutive sentences for offenses arising from one course of conduct.
In State v. Hubb, 97-304 (La.App. 5 Cir. 9/30/97), 700 So.2d 1103, eight-year sentences were not constitutionally excessive for two defendants who pled guilty to sexual battery. The defendants "french" kissed both victims on several occasions. One defendant exposed his genitals to both children and forced one of the children to fondle him, and the other defendant attempted to make one of the children fondle him and showed the other child photographs of nude women. One of the defendants had no criminal history; the other had only misdemeanor offenses.
In State v. Toups, 546 So.2d 549 (La. App. 1 Cir.1989), the defendant was sentenced to eight years for the sexual battery of a five-year old child who was the daughter of his girlfriend. The child testified that he had touched her private place and forced her to rub his. Despite having no prior felony convictions, the appellate court found that the sentence close to the maximum was not excessive.
As to the cases cited by the appellant, in none of them did the court find the sentences excessive. Furthermore, the cases arguably are distinguishable. In State v. Castillo, 97-595 (La.App. 5 Cir. 11/25/97), 705 So.2d 751, the defendant received a three-year sentence for putting his hands into a nine-year old child's pants, rubbing her posterior, and placing his finger into her vagina. However, the defendant also entered a guilty plea, thus sparing the child the necessity of testifying in open court; a lesser sentence for virtually the same action as in the instant case is thus justified.
Similarly, in State v. Wilturner, XXXX-XXXX (La.App. 3 Cir. 11/5/03), 858 So.2d 743, the defendant received a five-year sentence for sexual battery of a twelve-year old mentally disabled boy. Although his actions were more egregious than in the instant case, he too pled guilty rather than forcing the victim to go to trial. The other cases cited by the appellant, State v. Smith, 34,325 (La.App. 2 Cir. 12/20/00), 775 So.2d 640, and State v. Wheat, 612 So.2d 176 (La.App. 1 Cir.1992), also involved guilty pleas.
The appellant's sentence falls within the mid-range of the statute as written at the time of the offense. It is not disproportionate to many other sentences imposed on first offenders and is not excessive.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER FIVE
In his fifth assignment of error the appellant avers that his trial counsel was ineffective in failing to move to quash the bill of information and in not filing a motion for a bill of particulars. He further avers that his counsel was ineffective because he did not file a motion in limine to exclude any reference to the allegation that the defendant blew a "raspberry" on the victim's anus after learning two days *1117 before trial that the victim and her witness had recanted the allegation.
As stated in State v. Reichard, XXXX-XXXX (La.App. 4 Cir. 6/21/06), 935 So.2d 727:
Ordinarily, an ineffective assistance claim is better addressed in an application for post-conviction relief filed in the trial court in which a full evidentiary hearing can be held. State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient to permit a determination of counsel's effectiveness at trial, the claims may be addressed on appeal. State v. Wessinger, 98-1234, (La.5/28/99), 736 So.2d 162; State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147; State v. McGee, 98-1508, p. 4 (La.App. 4 Cir. 3/15/00), 758 So.2d 338, 341; State v. Causey, 96-2723, p. 10 (La.App. 4 Cir. 10/21/98), 721 So.2d 78, 84. Indeed, when the appellate record is sufficient, "the interests of judicial economy justify consideration of the issues on appeal." State v. Kanost, 99-1822, p. 6 (La.App. 4 Cir. 3/29/00), 759 So.2d 184, 188. Such is the case here.
The standard for assessing an ineffective assistance of counsel claim is well-settled; the two-prong standard enunciated in the seminal case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), must be applied. State v. Fuller, 454 So.2d 119 (La.1984); State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on reh'g); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, a defendant must establish both that counsel's performance was deficient and that the deficiency prejudiced the defendant. State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. As to the former, the defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" the Sixth Amendment guarantees. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, 97-2061, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. As to the latter, the defendant must show that "counsel's errors were so serious as to deprive him of a fair trial, i.e., a trial whose result is reliable." McGee, 98-1508 at p. 5, 758 So.2d at 342. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
An "effective counsel" has been defined as "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." State v. Anderson, 97-2587, p. 7 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 19 (citing, State v. Seiss, 428 So.2d 444 (La.1983)). Given that "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Crowell, 99-2238, p. 8 (La.App. 4 Cir. 11/21/00), 773 So.2d 871, 878 (quoting State v. Brooks, 505 So.2d 714, 724 (La.1987)). It follows then "trial strategy" type errors do not constitute ineffective assistance of counsel. Crowell, 99-2238, at p. 8, 773 So.2d at 878 (citing State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir.1986)); State *1118 v. Bordes, 98-0086, p. 8 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147 (quoting Bienemy, 483 So.2d at 1107 (noting that "[t]his court has previously recognized that if an alleged error falls `within the ambit of trial strategy' it does not `establish ineffective assistance of counsel.'"))
Reichard, pp. 4-6, 935 So.2d at 730-31.
As to the first complaint, the record is clearly sufficient to resolve the question. Even if defense counsel should have requested a bill of particulars, there is no indication that the appellant was prejudiced. Counsel was well aware of the specific allegations against his client and was well-prepared for trial. There is absolutely nothing in the record to indicate that, even if a bill of particulars had been provided, counsel would have been prepared better or differently. As discussed in connection with the appellant's first assignment of error, the preliminary hearing, arrest warrant application, and police report all provided defense counsel with sufficient information to determine the particulars of the allegations against which he had to mount a defense.
As to the second complaint, the record also appears sufficient. The claim arises from the fact that the prosecutors advised the defense counsel that, in an interview with the two girls prior to trial, the girls had recanted the allegation that the appellant had blown a "raspberry" on the victim's anus. The appellant suggests that it was deficient conduct on the part of his counsel to explore this allegation during cross-examination of the children because it constituted evidence of the separate crime of oral sexual battery, La. R.S. 14:43.3, for which he had originally been arrested pursuant to a warrant, but for which he was not prosecuted. Thus, the appellant argues, his counsel erroneously allowed an unadjudicated sexual crime into evidence, instead of moving to exclude any reference to it or obtaining a stipulation that the girls had changed their stories.
Here, the record does not affirmatively show why counsel chose to question the girls about the discrepancy between what they originally reported regarding the "raspberry" incident and what they told the assistant district attorneys just prior to trial. However, it appears to have been a conscious choice of trial strategy. The central issue in the case was the credibility of E.M. and M.M. Defense counsel carefully elicited that both girls had changed their statements in an obvious attempt to impeach their credibility. Notably, when counsel questioned M.M. about her inconsistent statement to the assistant district attorney, the State objected repeatedly and unsuccessfully. Defense counsel then elicited from M.M. that, after speaking to the prosecutors the day before trial, her mother told her what to say at trial. The prosecutor objected again when defense counsel questioned E.M. about the change in her statement. Defense counsel was able to have E.M. admit that she told the prosecutors that she "made up" this particular allegation against the appellant, although she also said she was confused when she spoke with them. E.M. also, like M.M., testified that her mother told her "to tell everybody about [a] raspberry being blown" on her anus.
Although the jury ultimately found that E.M. and M.M. were credible, it appears that defense counsel made a calculated choice to attack their credibility with the fact that they recanted a portion of the allegations when they spoke to the assistant district attorneys prior to trial. The fact that a strategy proves unsuccessful does not constitute ineffective assistance of counsel.
This assignment of error lacks merit.
*1119 ERRORS PATENT/ASSIGNMENT OF ERROR NUMBER SIX
In his final assignment of error, the appellant requests review of the record for any errors patent, which review this Court undertakes even in the absence of an assignment of error. That review reveals no errors.
For the above and foregoing reasons we affirm the appellant's conviction and sentence.
AFFIRMED.
BELSOME, J., dissents with reasons.
BELSOME, J., dissents with reasons.
I respectfully dissent from the majority's opinion.
The appellant, Danny Galindo has cited six assignments of error. However, all can be encapsulated into an assertion of a violation of his Due Process rights under the Fourteenth Amendment. He argues that the evidence relied upon for prosecution is so insufficient and problematic that his conviction cannot be upheld. It is further noted that prior to trial key statements made by the minor victim and her only witness, also a minor, were withdrawn. The exact nature and content of the recanted statements is not specifically mentioned in the record. It can however be ascertained from the record that the State withdrew the original charge of oral sexual battery which comprised the initial reason for the investigation and subsequent arrest. Also, on cross-examination the girls admitted to a recantation of their statements regarding the appellant blowing a raspberry on E.M.'s butt. Consequently, we are left with at best inconsistent victim statements that appear to have been withdrawn or at worst a conviction knowingly obtained with perjured testimony.
The United States Supreme Court has held that knowingly using perjured testimony is grounds to vacate the conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) see also, Jenkins v. Artuz, 294 F.3d 284, 293 (2d Cir.2002). It follows that when representatives of the State knowingly use false testimony that is any way relevant to the case, to obtain a conviction, that conviction violates an individual's due process right under the Fourteenth Amendment. Napue v. Illinois, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).
In Jenkins v. Artuz, supra, Jenkins was convicted of murder and criminal possession of a weapon. Jenkins filed a writ of habeas corpus that was granted by the district court and affirmed by the appellate court. One claim raised by Jenkins was that false testimony of a witness at trial and state attorney's conduct violated his right to due process. At trial, the State offered two witnesses with direct testimony linking Jenkins to the murder. The first claimed to be an eyewitness. His testimony contained numerous inconsistencies and contradicting statements. Next the State produced David Morgan, who claimed he had witnessed a fight between Jenkins and the victim the day before the murder.
In exchange for Morgan's testimony, the State had offered him a plea agreement for his recent arrest for possession of crack cocaine with the intent to sell. During the defense's cross-examination, Morgan falsely denied the existence of the plea agreement. On redirect, the assistant district attorney in the case reinforced the impression that no plea agreement existed. Later in the course of the assistant district attorney's summation, she reminded the jury of Morgan's testimony regarding the *1120 absence of any plea agreement and went on to bolster his credibility.
The Jenkins court found that the prosecutorial misconduct in Jenkins' trial so infected the trial with unfairness as to make the resulting conviction a violation a denial of due process.
The instant case presents similar issues. While we cannot determine the precise details of the recantations, we know, through the girls' testimony, that statements previously withdrawn were subsequently used at trial to convict the appellant. M.M. was called as a witness for the sole purpose of eliciting knowingly false statements for the jury.
This level of apparent prosecutorial misconduct cannot be overlooked when reviewing the correctness of the appellant's conviction. The State further prejudiced his right to a fair trial during closing arguments by placing its credibility behind the witness's statements. This is evidenced by the following statements: "[y]ou saw Emily take the stand . . . she told you exactly what happened. She didn't lie. She didn't lie." The assistant district attorney essentially vouched for the girl's credibility with full knowledge that her testimony was based on recanted statements. While an attorney should vigorously argue their case, they must not do so by knowingly using false information. See, Jenkins, supra and Agurs, supra.
Analysis of the Evidence
Upon careful review of M.M.'s testimony in its entirety, this writer was deeply troubled by the fact that she rarely testified to anything. Rather, she gave nods while the district court allowed the State to ask leading questions which essentially equated to the State testifying. After M.M. repeatedly claimed she could not remember anything happening, the State was permitted to ask: "[d]o you remember if Danny Galindo touched Emily?" M.M. replied with an affirmative nod and was then told to say where. M.M. then replied "[o]n the butt." However, on cross-examination M.M. admitted that she told the assistant district attorneys that she had not seen Danny touch E.M. and finally conceded that her mother had instructed her on what to say at trial.
The girls' statements and allegations against the appellant are fluid in that they are ever changing. The original story was presented by M.M., who claimed she saw E.M. take off her pants and jump on the bed. Then she said the appellant went into the room and blew a raspberry on E.M.'s butt. We now know this was untrue, but it lead to E.M. being questioned about past behavior. Based on her mother's testimony E.M. said that "Danny" would touch her on her vagina. This is the statement reported to the police and video taped. However, during E.M.'s interview at Children's Hospital she adopted M.M.'s version of the story regarding the "raspberry," a statement she later recants. Additionally, in the taped interview played for the jury, E.M. says that M.M. was running around Danny's house naked. Inexplicitly, the interviewer does not entertain the validity of that statement but only focuses on the other part of E.M.'s story, where she claimed that the appellant would just pull her pants down, touch her and leave the room. Where does fact separate from fiction substantially enough to support a conviction?
The test for determining the sufficiency of evidence to support a conviction was set forth in State v. Armstead, XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 389, 393:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the *1121 light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d 1305; Green, 588 So.2d 757.
The State's case against Danny Galindo is woefully deficient. There is no physical evidence nor are there any eyewitnesses. The State called M.M as a witness, even though the State knew she had not witnessed anything. Furthermore, E.M.'s testimony must be carefully scrutinized, especially in light of the prosecuting attorney bolstering her testimony regarding the raspberry in an effort to make recanted statements appear believable. But most importantly, she too testified that her mother told her what to say. The State offers little more than potentially perjured testimony to send the appellant to prison for six years without benefit of probation, parole or suspension of sentence. Clearly this is a case that warrants the reviewing court to impinge upon the fact finder's discretion in order to guarantee the fundamental protection of due process of law.
After reviewing the evidence in the light most favorable to the prosecution, I disagree with the majority's opinion, affirming the appellant's conviction. Danny Galindo's right to a fair trial was unequivocally violated. Given the despicable nature of the alleged crime and the age of the alleged victim, it is easy to see how emotion, not fact could influence the jurors. However, I disagree that any reasonable person could conclude that the evidence proved beyond a reasonable doubt that the appellant committed the crime of sexual battery. Accordingly, I would reverse the conviction and vacate the sentence.
NOTES
[1] M.M.'s testimony at trial was very vague as to any details, and she indicated that she both saw an incident and that E.M. told her about it. However, when asked why she told her mother abut the defendant, she said it was because she did not want her friend to "get hurt."
[2] The initial sentence, imposed on August 19, 2005, did not deny benefits. On August 26, 2005, at the time the court denied the motion to reconsider sentence, the court amended the sentence to deny benefits, a mandatory prohibition under the statute. See La. R.S. 14:43.1(C). It should be noted that La. R.S. 14:43.1(C) was subsequently amended to provide that, if the victim is under the age of thirteen years and the offender over seventeen, the mandatory minimum sentence is twenty-five years without benefits; the maximum is life imprisonment. Under the present provision, the appellant would be subject to this greater penalty.
[3] The court explained that, during trial, it could hear but not see the video as it was played for the jury.